REVISED

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 94-20783
_____

TRIAD ELECTRIC & CONTROLS, INC.,

Plaintiff/Counter-Defendant
Appellant/Cross-Appellee,

versus

POWER SYSTEMS ENGINEERING, INC., ET AL.,

Defendants,

POWER SYSTEMS ENGINEERING, INC.;
CENTURY CONTRACTORS WEST, INC.;
EMPLOYERS INSURANCE OF WAUSAU, INC.

Defendants/Counter-Claimants
Appellees/Cross-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas

_____

June 30, 1997

Before HIGGINBOTHAM, SMITH, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

The primary issues arising out of this Texas diversity action, concerning a construction contract dispute tried to the district court, are whether the court reversibly erred first, by allowing, after close of the evidence, the addition of a fraud counterclaim, and second, by then ruling in favor of that new claim, including

awarding punitive damages of $3 million, without allowing the counterclaim defendant, Triad Electric & Controls, Inc., to defend, post-addition, against the claim. Triad, the electrical subcontractor on a construction project, appeals a take-nothing judgment on its contract-based claims against both the project owner's engineer, Power Systems Engineering, Inc. (PSE), and the general contractor, Century Contractors West, Inc.; the judgment for Century on its counterclaim for overpayments; and the judgment for Century and PSE on their counterclaim for fraud. Century cross-appeals the denial of attorneys' fees. We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

## I.

The following factual scenario is based primarily on the voluminous and detailed findings of fact by the district court, which, for the most part, Triad does not contest. In mid-1983, PSE invited Century and other general contractors to submit bids for the construction of a cogeneration facility (electricity and steam) at a refinery near Houston, Texas. The PSE-provided bid package consisted of engineering drawings, which included cable schedules describing the electrical connections to be installed and setting forth the approximate wire footage; the Specification for General Construction, which established the quality and quantity standards for the facility, specified types of material and construction codes and practices, and incorporated by reference the PSE Standard

- 2 -

Specifications; and the Design Control Specification (DCS), a narrative document describing generally the facility's systems, operating parameters, and major items of equipment.

At that time, the facility's design was only partially complete; portions of it were described in detail in the engineering drawings and the Specification for General Construction, but other portions were described only in a narrative manner in the DCS. In fact, the facility was to be constructed as a "fast track" project; construction was to begin before the design drawings were complete, and PSE continued to work on the design after issuing the bid package.

PSE requested two bid prices from each invited general contractor: a "base" bid, based on the incomplete drawings included in the bid package; and a "guaranteed maximum" bid, which was to include all work necessary to complete the project in accordance with the DCS. Pursuant to the base/guaranteed maximum concept, the successful bidder would receive extra payment, above the base price, for any changes in the work described in the incomplete drawings, up to the amount of the guaranteed maximum; but, generally, the cost above that maximum, due to further changes to the drawings, would be at the successful bidder's risk. The successful bidder would, however, be entitled to receive payment above the guaranteed maximum price for work performed pursuant to changes to the DCS.

In September 1983, Century and other general contractors bidding on the project invited Triad and other electrical subcontractors to bid the electrical and instrumentation portions. Century furnished Triad with the portion of the bid package pertaining to that portion of the work, including the Specification for General Construction with attachments, the electrical drawings, the piping and instrumentation diagrams, and the DCS. Century invited only prequalified subcontractors to bid on the project; prequalification was based partially on each subcontractor's representation that it was experienced in bidding projects from conceptual design documents. Triad made such a representation.

Addendum No. 1 to the Specification for General Construction, which was included in the bid package furnished to Triad, requested that the electrical and instrumentation contractors "provide (a) a base bid ... and (b) a guaranteed maximum bid". The base bid was defined as the "Scope of Work shown in [the] General ... Specification", which incorporated the engineering drawings. On the other hand, the "guaranteed maximum bid" was defined as the "Scope of Work in [the] General ... Specification ... plus that additional amount necessary to furnish a plant which will start-up and operate as stated in the [DCS]".

The base/guaranteed maximum concept was defined further in PSE's 22 September 1983 Clarifications to Addendum No. 1:

> The [DCS] establishes the design basis for an operable and reliable plant as defined by [PSE]. The conceptual design, process design,

and detail engineering design will be performed by [PSE]. There is no requirement for detail design evaluation, system evaluation, detail auditing of PSE engineering calculations, etc. The contractor is to provide (a) a base bid based on the bid documents, and (b) a guaranteed maximum bid based on the level of confidence the contractor feels that the plant described in the Bid Documents can start-up and operate as defined in the DCS.

Contrary to the foregoing, however, Triad submitted an unpriced "scope letter" to Century on 28 September 1983, stating that the electrical scope of work was "based on the cable schedules", which were part of the drawings included in the bid package. Triad verbally informed Century that it would perform the scope of work described in that letter for approximately $2.9 million. But, Triad submitted bids of approximately $3.9 million to three other general contractors, Century's competitors.

In November 1983, Century advised Triad that its initial bid was non-responsive because Triad was not allowed to limit its scope of work to the cable schedules; instead, it had to include everything shown, implied, or required by the DCS. Century gave Triad the option to participate in a base/guaranteed maximum bid, as in the Century/PSE contract, but Triad declined.

Triad submitted its final proposal to Century in December 1983. That proposal removed the qualification/limitation to the cable schedules, and proposed a price of approximately $3.1 million.

Subsequent to the 15 November 1984 Century/PSE contract, Century issued a letter of intent to Triad in February 1985, and Triad began work on the project. After several months of negotiations over the Triad subcontract drafted by Century, it was signed in mid-June 1985.

Triad's subcontract consists of a Purchase Order and a Subcontract Agreement which required it to supply all labor and materials required for the installation of complete and operational electrical and instrumentation systems for the "GUARANTEED MAXIMUM LUMP SUM PRICE" of $3.4 million. In defining the scope of work, the Purchase Order referenced the following: (1) the contract specifications, as modified; (2) the DCS; (3) listed drawings, which included the cable schedules; (4) an equipment list; and (5) a list of instruments to be installed, calibrated, and connected by instrumentation wiring. Those listed drawings -- the contract drawings -- were the same as those included in the bid package.

After construction began, PSE decided, in order to take advantage of tax incentives, to shorten the contract schedule so that it could complete the facility by the end of 1985 (approximately two months earlier than called for in Triad's subcontract). PSE, Century, and Triad anticipated that Triad could experience additional costs as the result of labor inefficiency due to the shortened schedule. PSE and Century agreed to compensate Triad for any man-hours over the number it had originally estimated

to perform its contractual scope of work, the assumption being that those extra hours would be the product of inefficiencies caused by acceleration.

In that regard, Triad advised PSE and Century that, without adjusting for extras or acceleration, it had estimated 83,000 man-hours to perform its scope of work. Even though PSE and Century each had independent estimates, the parties agreed to use Triad's estimate as the base.

In mid-July 1985, after several months of negotiations, and approximately one month after the Century/Triad subcontract was executed, PSE, Century, and Triad entered into an agreement governing Triad's compensation for the accelerated work (the acceleration agreement). And, pursuant to acceleration agreement ¶ 1, PSE and Century advanced $372,338 to Triad in a series of progress payments, with each payment the subject of a change order to the Triad subcontract.

In contrast to its accepted 83,000 hours estimate, Triad used approximately 119,000 to complete its portion of the work, and sought additional compensation pursuant to acceleration agreement ¶ 3. PSE and Century refused to pay Triad any amount under ¶ 3, maintaining that the earlier ¶ 1 payment was an advance toward the total due under ¶ 3, which was to be adjusted at the end of the job to account for Triad's actual efficiency losses.

Shortly before completion of the project at the end of 1985, Triad submitted to Century, and Century submitted to PSE, various extra work order requests (EWOs) for payment above the contract price, arising out of design changes that had increased Triad's scope of work (drawing EWOs). Triad's first drawing EWO submittal consisted primarily of stacks of invoices in no particular order; PSE rejected it as unintelligible; and Triad resubmitted the EWOs in a different format. In preparing its drawing EWOs, Triad compared the work called for by the contract drawings (as noted, those listed in the Purchase Order) with the work done pursuant to the later "issued-for-construction" drawings.

Triad also submitted EWOs for extra work that it had been directed to perform in the field (field EWOs). Triad's EWOs (drawing and field) requested approximately $2 million. (At trial, Triad admitted that, even without the contested EWO payments, it made a profit of approximately $350,000. It demanded nearly $3 million in this action.)

While Century and PSE were reviewing Triad's EWOs, Triad claimed that it was experiencing a negative cash flow; PSE agreed to make interim payments to Century, to be passed on to Triad, subject to adjustment upon completion of the EWO review process. In early 1986, approximately $620,000 of the approximately $1.8 million requested by the drawing EWOs was advanced to Triad, subject to further review and verification.

PSE, Century, and Triad agreed in April 1986 to designate one field engineer from each entity to review and evaluate 11 of Triad's largest drawing EWOs. After doing so, the engineers reached agreement on nine. They, however, did not have authority to settle the EWO claims. PSE and Century did not agree with the results of the engineers' review, on the grounds that the analysis was based on a misunderstanding of Triad's contractual scope of work.

Century advised Triad in August 1986 that Triad's scope of work was not limited by the contract drawings; and that the only compensable changes were changes to the scope of work defined by the DCS. Triad countered that its scope of work was limited to what was shown on the contract drawings, plus items specified in the DCS but not shown on those drawings. Simply put, the primary dispute centered around increased cost to Triad for changes in the design of the items specified in the DCS, as reflected in the contract drawings, including changes both in the type conduit and cable required and in the location of the specified items.

Triad filed this action in November 1986, ultimately resulting in claims against Century and PSE for payment for extra work, for sums due under the acceleration agreement, and for breach of contract in connection with the acceleration. Century counterclaimed for overpayment to Triad for extras and for design

changes that deleted work from Triad's contractual scope of work; PSE did not seek affirmative relief.

The case was trifurcated for trial. Phase I was to adjudicate whether, through the engineers' review, the parties had settled approximately $1.1 million of Triad's EWOs; Phase II, to be tried to a special master, was to address the amount due Triad for unsettled EWOs; and Phase III, to be tried to the district court, was to decide Triad's acceleration claim and any other unresolved issues.

Phase I was conducted in early 1991. In mid-1992, the district court entered very comprehensive findings and conclusions. It rejected Triad's claims that the nine largest drawing EWOs had been settled by the engineers' review, holding both that they did not determine any contractual scope issues, and that PSE's and Century's engineers lacked authority to settle any EWOs. (Triad does not appeal that ruling.)

The district court held further that Triad's subcontract was unambiguous; that it required Triad to perform a "guaranteed maximum" scope of work; and that Triad was entitled to be compensated only for design changes that were outside the "scope of the DCS or resulting from PSE's 'gold plating'". The court found that, after the dispute over Triad's scope of work arose in 1986, Triad had lost its original estimate file; and that, in light of the lack of any satisfactory explanation for the file's disappearance, "production of Triad's estimate would show that it

understood that it was required to supply a guaranteed maximum scope of work".

After entry of the Phase I rulings, and on motion of the defendants and over Triad's objection, the district court revoked the "trifurcation" plan. Instead, the remaining issues would be tried to the court (Phase II).

Phase II commenced in January 1993. At the conclusion of Triad's case-in-chief, and pursuant to FED. R. CIV. P. 52(c), the court dismissed Triad's claim for design change extras, reserving decision on Triad's claims for field extras and acceleration.

Moreover, during argument on the Rule 52(c) motion, Century moved orally to amend its counterclaim to conform to the evidence, stating that it would file a written motion for leave to add a counterclaim for fraud, including $10 million in punitive damages, "before the end of the week"; PSE announced that it would seek sanctions. Triad objected to both.

This notwithstanding, the trial proceeded without any ruling on Century's oral "motion". In fact, all parties rested the very next day. PSE announced that it would join Century's motion to add the claim.

Three weeks after the close of the evidence, Century and PSE filed the motion for leave to add a fraud claim, including seeking punitive damages. They maintained that, during Phase II, they had first learned that Triad's claims for extras and for acceleration inefficiencies were founded on material and intentional

misrepresentations, including the time originally estimated to perform Triad's contractual scope of work and the extent of Triad's knowledge of that scope. Century and PSE also submitted proposed findings of fact and conclusions of law, including that Triad had committed fraud and was liable for punitive damages. Triad objected; alternatively, it moved to reopen the record, for a continuance, and for a jury trial because new fact issues had been raised in the proposed claim.

Approximately a year and a half later, in September 1994, the district court granted leave to add the fraud claim and denied Triad's motion for a continuance and jury trial. Accordingly, the next day, the court entered judgment for Century for $593,215 for overpayments, and for PSE and Century on the joint fraud claim for $372,338 in compensatory damages and $3 million in punitive damages. All of Triad's claims were disallowed.

The district court found that Triad had "rigged the bid process" by intentionally underbidding the job by $1 million; that "Triad never intended to perform the guaranteed maximum scope of work required by its contract ... [but] secretly intended to recoup its underbid amounts through the submission of false and fraudulent extra work claims"; that Triad's claims for extras were for work that was part of Triad's guaranteed maximum scope; that Triad had intentionally misrepresented "the number of man-hours [83,000] required to perform its contractual scope of work"; that, in reliance on that misrepresentation, Century and PSE had advanced

- 12 -

$372,338 under acceleration agreement ¶ 1; that Triad had destroyed the original of its 1983 estimate file to conceal its fraud; that, because Triad underbid its work, it should not have made any profit; that Triad's EWO analysis was flawed because it assumed "that PSE could not alter its preliminary and incomplete bid drawings without having to pay additional compensation to Triad for the change"; that Century had proved entitlement to a refund of $593,215; and that the acceleration agreement was unenforceable because it had been procured by Triad's fraud.

Concerning the newly added fraud claim, the court rejected Triad's contention that it was prejudiced by lack of both notice and an opportunity to defend against the claim, reasoning that Triad could not claim surprise or prejudice because PSE and Century's case for fraud and concealment was made "from the mouths of Triad's own witnesses". The court stated further that Triad was on notice of "a claim of intentional wrongdoing" by virtue of the statement in the pretrial order inserts of PSE and Century that "Triad, at best, misconstrued and at worst misrepresented that the drawings ... resulted in changes to Triad's contractual scope of work". The court excused PSE and Century's delay in presenting the fraud claim on the basis that they "could not discover the fraud until the trial of the case because Triad was actively attempting to conceal it". And, the court held that Triad was not entitled to a jury trial on the fraud claim because it presented no new fact

issues, "only a new theory of recovery arising out of the same circumstances and events".

After Triad filed its notice of appeal, PSE and Century moved for attorney's fees and sanctions, and to fix prejudgment interest; the motions were heard in January 1995. While they were under advisement, Triad moved for Rule 60(b) relief on the grounds of newly-discovered evidence (the missing original estimate file, which Triad claimed to have located and offered to make available to the court and opposing counsel); misrepresentations by PSE and Century in their proposed findings; and procedural and fundamental due process deficiencies. The court, *inter alia*, denied the Rule 60(b) motion without a hearing; and denied PSE and Century's requests for sanctions and attorney's fees.

In denying Rule 60 relief, the court held that Triad's newly found estimate file was not "newly discovered" evidence within the meaning of Rule 60(b)(2), but was merely "newly produced"; and that the production of the file would not have changed the trial result. The other grounds asserted by Triad (denial of due process, right to a jury trial, misrepresentations by PSE and Century) were rejected as an attempt to use Rule 60(b) as a substitute for appeal. (Triad appealed the order denying Rule 60(b) relief, but did not brief that issue specifically; accordingly, it is abandoned.)

II.

Century's cross-appeal for attorney's fees will be addressed after the issues presented by Triad.  It contends that the take-nothing judgment is based on erroneous interpretations of the subcontract and of the acceleration agreement, and that the fraud judgment cannot stand because of insufficient evidence and procedural and constitutional violations.  Of course, we review the district court's factual findings only for clear error and its conclusions of law *de novo*.  F*ED*. R. C*IV*. P. 52(a)*; e.g., **Johnson v. Gambrinus Co./Spoetzl Brewery***, 109 F.3d 1040, 1044 (5th Cir. 1997).

In our application of this clearly erroneous standard, Triad urges that we "take into account the district court's lack of personal attention to factual findings" in light of its "almost verbatim" adoption of the defendants' proposed findings.  Our court recently commented on that practice in **Marine Shale Processors, Inc. v. U.S. E.P.A.**, 81 F.3d 1371, 1386 (5th Cir. 1996), *cert. denied*, ___ U.S. ___, 117 S. Ct. 682 (1997):

> [W]e note that district courts occasionally adopt wholesale the findings of fact and conclusions of law written by a victorious litigant.  While we discourage this practice, we have never radically altered the standard of review in such cases, much less concluded that such an adoption results in a per se due process violation....  We tolerate the occasional use of this device because of our trust that district courts will closely examine the proposed findings and will carefully consider the objections and arguments of the opposing party.

- 15 -

Indeed, the findings and conclusions are almost identical to those proposed by the defendants. But, based on our review of the record, we are confident that the district court closely examined the proposals and likewise considered most carefully Triad's position. Moreover, in applying the clearly erroneous standard, the findings are tested against the record. Finally, as noted, for the most part Triad does not contest the findings. In sum, an altered standard of review -- if that is what Triad is suggesting -- is not in order.

## A.

With respect to Triad's EWO claims, the central issue is whether its subcontract allows payment above the "guaranteed maximum lump sum" price for work performed as a result of changes to the design shown in the contract drawings, or whether, as the district court held, additional payment is due only for work resulting from either changes to the DCS or PSE's "gold plating". The answer turns on the intended meaning of the contract phrase "guaranteed maximum".

Needless to say, whether a contract is ambiguous, as well as the interpretation of an unambiguous contract, are questions of law reviewed *de novo*. *E.g.*, *Clardy Mfg. Co. v. Marine Midland Business Loans Inc.*, 88 F.3d 347, 352 (5th Cir. 1996), *cert. denied*, ___ U.S. ___, 117 S. Ct. 740 (1997). The district court held that the contract was unambiguous; that it required Triad to furnish the

- 16 -

same scope of work as Century owed to PSE; that the main document which defined Triad's guaranteed maximum scope of work was the DCS; that Triad's contractual scope includes everything necessary to provide complete and operational systems for the facility within the scope of the DCS; and that, as a result, Triad was entitled to additional payment only for work added outside the scope of the DCS or resulting from PSE's "gold plating".

Triad does not contend that the subcontract is ambiguous; instead, that the court interpreted it erroneously. Triad asserts that the conclusion that the DCS defined Triad's scope, and that everything else was subject to change without causing an increase in Triad's price, even if the contract design would have produced a complete and operational plant, is inconsistent with the subcontract's definition of "guaranteed maximum" and contradicts the plain language of the subcontract, which expressly tied Triad's scope of work to the underlying contract drawings, as well as to the DCS.

Before turning to the contract documents, at least some light needs to be shed on Triad's suggestion that the original design would have produced a complete and operational facility. Triad's reliance on its expert's opinion that the quantities shown on the contract cable schedules were adequate to construct a facility that would start-up and operate is misplaced. For starters, although the expert reviewed the bid package, including the DCS, he did not

review Triad's contract.  Moreover, Triad agreed that the job, as bid, was only approximately 70% engineered.

In any event, Triad subcontract ¶ 1, entitled "Scope of Work", provides that Triad "shall perform ... the work ... [i]n accordance with plans, specifications and addend[a] listed on page (1) of [the] Purchase Order".  And, Purchase Order page one provides that Triad is to

> complete all Electrical/Instrumentation work in complete accordance with the intent of the contract specifications, *as modified by* Addendum 1 dated September 14, 1983, clarifications to Addendum 1 dated September 22, 1983, Addendum 2 dated October 10, 1983, drawings as listed on Attachment 1, *and the Design Control Specification dated August 31, 1983 modified by Revision 1 dated October 10, 1983, and Revision 2A dated December 5, 1983*.

(Emphasis added.)  The Purchase Order then provides that "[a]ll of the following items shall be furnished complete and provide complete operational systems meeting all requirements of the Contractor, Engineer and owner, but not limited to", and lists a number of items Triad is to provide, "ALL FOR THE GUARANTEED MAXIMUM LUMP SUM PRICE OF $3,400,000".

The Specification for General Construction, referenced in the Purchase Order, contains a detailed definition of Triad's scope of work:

> 1.0 <u>SCOPE OF WORK</u>
>
> This specification covers the ... performance of all work necessary for construction of a Cogeneration Facility....  The work shall include

the items described in the contract drawings and this specification. In the event of conflict between the drawings and specification involving quality or quantities, THE HIGHEST QUALITY AND THE GREATEST QUANTITY SHALL BE FURNISHED. The contract drawings and specification are complementary and what is required by either shall be as if required by both, unless specifically stated otherwise. Information presented on the drawings is as accurate as surveys and planning can determine; however, field verification of all dimensions is directed. In the event of conflict between the drawings and specification involving errors, omissions, or inconsistencies, the Contractor shall notify [PSE] of such conflict for the purpose of clarification or correction.

.1    Work Included

.1 Perform all work described to the extent shown on the drawings listed on the attached [PSE] Drawing Index (Attachment 1) Vendor Drawing Index (Attachment 2), and as described in this specification.

Among the drawings listed on the PSE Drawing Index (Attachment 1) attached to the Specification for General Construction were cable schedules, specifying wires and cables by size, type, and approximate length, associated hardware, and items to be connected.

Addendum 1, referenced in the Purchase Order, defined the guaranteed maximum price to include the "Scope of Work in [the] ... Specification for [General] Construction ... *plus the additional amount necessary to furnish a plant which will start-up and operate as stated in the Design Control Specification*". (Emphasis added.) And, as noted *supra*, the clarifications to that Addendum, also referenced in the Purchase Order, provide:

> The [DCS] establishes the design basis for an operable and reliable plant as defined by [PSE]. The conceptual design, process design, and detail engineering design will be performed by [PSE]. There is no requirement for detail design evaluation, system evaluation, detail auditing of PSE engineering calculations, etc. The contractor is to provide (a) a base bid based on the bid documents, and (b) a guaranteed maximum bid based on the level of confidence the contractor feels that the plant described in the Bid Documents can start-up and operate as defined in the DCS.

Thus, according to the definitions of "guaranteed maximum" in the addenda, to the extent that the DCS described items that the drawings did not address, the "Guaranteed Maximum Price" would include the work associated with such items. Pursuant to that definition, Triad assumed the risk that it had included in its guaranteed maximum price a sufficient contingency to cover the labor and materials necessary to complete the work in accordance with the manner in which PSE chose to fill in the gaps left by the contract drawings and specifications.

In addition, the district court held that Triad also assumed the risk that it had included in its price a sufficient contingency to account not only for completion of the design, but also for changes in the contract drawings, so long as the changes were neither "gold plating" nor outside the scope of the DCS. Triad contends that its subcontract does not cover the risk that PSE would change completed designs shown in the contract drawings, and that the district court's conclusion to that effect was based on an

October 1983 agreement between PSE and Century, to which Triad was not a party.  That PSE/Century agreement, which defined and limited the design modifications that would result in a change to Century's Guaranteed Maximum Price under its contract with PSE, provided:

> Engineering changes are [guaranteed maximum] changes only if they are outside of the scope of the [DCS] or if they cause work out of the normal sequence of work....  Engineering errors are a change to the [guaranteed maximum].  Changes to Owner furnished equipment are changes to the [guaranteed maximum].

Triad asserts that the absence of similar language in its subcontract establishes conclusively that Triad was not required to accept the risk that PSE might change the design shown in the contract drawings.

Century acknowledges that language similar to the PSE/Century definition of guaranteed maximum was not incorporated in the Triad subcontract (or even in the PSE/Century contract); but, it asserts that the concept embodied in that October 1983 PSE/Century agreement was contained in Triad's subcontract.  Century concedes further that the final design, as shown in the issued-for-construction drawings, required Triad to install more cable than detailed by the contract drawings.  But, Century points out that the contract cable schedules show all cable lengths as "APPROX." Further, it relies on Purchase Order ¶ 11, which requires Triad to

> [f]urnish and install Electrical/Instrumenta-tion items such as but not limited to: cable tray, conduit and cable of certain items as

> described in the [DCS] and or the addendums. *Cable for these items are [sic] over and above the quantities specified in the Cable Schedules*.

(Emphasis added.)

According to Century, this ¶ 11 clearly expresses the parties' intent that Triad could not limit its scope of work, in this regard, to installing the quantity of cable specified in the contract cable schedules, and establishes that Triad assumed the risk that the contract cable schedules would be changed as PSE completed the design. Century maintains that, because ¶ 11 specifically prohibited Triad from limiting its electrical scope of work to the cable schedules, the only document to provide a limitation on that scope was the DCS; accordingly, by definition, only changes to the DCS could constitute a change to the guaranteed maximum scope of work.

Triad responds that Century's interpretation of ¶ 11 makes other, more specific provisions of the contract meaningless or nonsensical. Such other provisions include Purchase Order ¶ 1, which defines Triad's work as "all Electrical/Instrumentation work in complete accordance with the contract specifications, ... drawings as listed on Attachment 1, and the [DCS]"; ¶ 9, relating to all lighting and power wiring, which states that "[c]onduit and cable to be included to the extent shown on the conduit and cable schedule"; and ¶ 16, which references the cable schedules as well as the DCS and addenda. According to Triad, the only way to read

¶ 11 consistently with the rest of the subcontract is to construe its use of the phrase "certain items" as referring to items in the DCS for which no detail drawings existed. Triad asserts that ¶ 11 makes plain that Triad was required to "fill in the gaps" in the design, because there were "certain items" in the DCS which were not covered by the cable schedules. According to Triad, the phrase "cable for these items" in ¶ 11 refers only to "certain items described in the [DCS]".

Triad's interpretation of ¶ 11 is inconsistent with the introductory clause on the first page of the Purchase Order, which requires Triad to furnish "all" work "complete" for "complete operational systems". Moreover, because everything to be installed in the plant is described in the DCS, the language of ¶ 11 applies to all cable installed by Triad, and not just to those items described in the DCS but not included in the cable schedules.

Finally, Triad contends that change order language in its subcontract contradicts the district court's conclusion that the subcontract definition of guaranteed maximum scope of work is consistent with the definition applied regularly in the construction industry (contractor to supply everything required for a complete and operational facility for a "guaranteed maximum" price). Triad notes that subcontract ¶ 4 provides that Triad's price is "subject to alterations as herein provided for"; and that ¶ 5, entitled "Extra Work", authorizes Century to "direct that subcontractor perform extra work or furnish additional materials",

and provides further that Triad's price is to be equitably adjusted.

Obviously, PSE and Century do not dispute that the contract envisioned the possibility of extra compensation if Triad was required to perform outside its contractual scope of work. Indeed, Triad was given credit for EWOs which resulted from changes to the DCS and from field extra work requests. But, this change order language is not inconsistent with the district court's interpretation, and it does not answer the question whether a particular change is a compensable change, *i.e.*, a change to Triad's contractual scope of work.

In sum, the district court correctly interpreted Triad's "GUARANTEED MAXIMUM LUMP SUM PRICE" to include all work except that performed as a result of either changes to the DCS or PSE's "gold plating".

B.

As discussed, Triad was paid $372,338 pursuant to the July 1985 acceleration agreement ¶ 1. That paragraph states that "[PSE] will pay Triad an additional $372,338 for acceleration of their base electrical contract". But, ¶ 3 of that agreement provides for payments to Triad based upon the following formula:

> A target incremental man-hour forecast of
> 25[%] over Triad's base contract was agreed
> for inefficiencies due to acceleration.
> Triad's base contract is 83,000 man-hours and
> the corresponding target increment for
> inefficiencies is 20,750 man-hours. [PSE] will

- 24 -

pay Triad for all man-hours over 83,000 and under 103,750 (83,000 + 20,750) at the contract rate of $22.43. The savings between the payment for incremental man-hours over 83,000 expended and the increment of 20,750 will be split 50-50 with Triad. Above the 25[%] target [PSE] will pay subcontractor's cost only, no profit. It was agreed that this hourly cost is $19.18 per man-hour. The maximum additional amount [PSE] will pay over the 25[%] target is $150,000. Change orders will be incrementally added to both the base and the target amount (25[%] of the base) for determination of the final sharing. This agreement on electrical work applies where the change order man-hours do not exceed 25[%] of the base man-hours. If the change orders exceed 25[%], this will be renegotiated for any impact caused by the additional changes.

In short, ¶ 1 speaks of payment for "acceleration" of Triad's work, while ¶ 3 speaks of payment to Triad for "inefficiencies due to acceleration". Triad sought payment under ¶ 3, but without giving a credit for the $372,338 paid under ¶ 1. In short, Triad contends that the ¶ 1 payment was a "sign-up bonus" for agreeing to accelerate; PSE and Century counter that it was an "advance".

For this question, the district court held that the acceleration agreement was ambiguous; accordingly, it allowed parol evidence. Based on testimony by PSE and Century officers, the court found that the parties intended that the amount paid under ¶ 1 was an advance, and that ¶ 3 contemplated a post-job reconciliation of Triad's actual efficiency losses, against which the advance would be credited.

The district court found also that Triad failed to prove its actual efficiency losses because it had lost its original estimate

file and because there was evidence that, in fact, Triad had not suffered a loss of productivity due to acceleration. (The court also refused to enforce the acceleration agreement because it concluded that Triad committed fraud, as discussed *infra*.)

Triad contends that the district court erred by holding that the acceleration agreement is ambiguous and, concomitantly, by allowing parol evidence. Triad asserts that the acceleration agreement called for unconditional, objectively quantifiable payments without regard to actual losses in Triad's productivity; that ¶ 1 was clear and unambiguous; that nothing in either paragraph tied the ¶ 1 payment to ¶ 3's formula; and that nothing in ¶ 3 mandated a credit for the ¶ 1 payment.

"The initial determination that a contract is *ambiguous*, such that its interpretation warrants the consideration of extrinsic evidence, is ... a legal conclusion subject to *de novo* review." ***Clardy Mfg. Co.***, 88 F.3d at 352 (emphasis in original). "[W]hen a contract is ambiguous and its construction turns on the consideration of extrinsic evidence, we review the district court's interpretation for clear error only." ***Id***. "We look to state law to provide the rules of contract interpretation." ***Id.***

"Under Texas law, a contract is ambiguous if, after applying established rules of interpretation, the written instrument 'remains reasonably susceptible to more than one meaning.'" ***Id***. (quoting ***R & P Enterprises v. LaGuarta, Gavrel & Kirk***, 596 S.W.2d

- 26 -

517, 519 (Tex. 1980)).  "In determining whether the language of the contract is unambiguous, ... we 'should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'" *Id*. (quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)).  But, "even when the contract is ambiguous, and parol evidence is therefore admissible to explain the ambiguity, such evidence is not competent to vary the terms of the contract or contradict the legal effect of its unambiguous provisions." *Caviness Packing Co. v. Corbett*, 587 S.W.2d 543, 546 (Tex. Civ. App. -- Amarillo 1979, writ ref'd n.r.e.).  As part of determining whether ambiguity exists, the court must look at the contract as a whole in light of the circumstances existing at the time of execution.  *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987).

The district court did not err by concluding that the acceleration agreement is ambiguous.  Paragraph 1 does not specify whether the $372,338 was a "sign-up bonus" or an "advance" to be credited later against the amount determined in accordance with ¶ 3.  And, Triad's claim that ¶ 1 should be examined independently from ¶ 3 is contrary to Texas law, which requires that the agreement be read as a whole.  It goes without saying that, because the agreement is ambiguous, parol evidence was admissible.  *See R & P Enterprises*, 596 S.W.2d at 519.

Likewise, the district court did not clearly err by finding that the parties intended the ¶ 1 payment to be an advance to finance inefficiencies subject to being adjusted pursuant to ¶ 3 at the conclusion of the project, when the number of inefficient man-hours could be calculated. There was testimony that the agreement was intended to compensate Triad for any inefficiencies in a way that would be fair to all of the parties. If the advance were treated as a "sign-up bonus", Triad could possibly be paid twice for most, if not all, of the same inefficiencies: under ¶ 1, and later under ¶ 3. Furthermore, ¶ 6, which provided for a "bonus" if Triad met certain project completion dates, indicates that the parties knew how to use that term when intended. Finally, in light of the evidence of the parties' intent, the fact that the $372,338 was paid pursuant to change orders (which, in fact, reference the acceleration agreement) to Triad's subcontract does not mean, as Triad contends, that Century treated the payment as a bonus.

Based on the foregoing, the district court correctly denied Triad's acceleration claims.

## C.

Long after the close of the evidence, the district court granted leave to add the fraud counterclaim. The next day, it held that Triad had committed fraud: (1) by inducing Century to advance over $600,000 by misrepresenting both that it had a negative cash flow and that the EWOs represented actual compensable changed work; and (2) by inducing Century and PSE to advance the $372,338 under

the acceleration agreement for anticipated inefficiencies, by misrepresenting that the 83,000 man-hours base was sufficient to perform Triad's contractual scope of work, when in fact it was adequate only for a "qualified" scope of work, based on the contract cable schedules.

Triad challenges the fraud judgment, including the $3 million punitive damages, on grounds that it did not have adequate notice of the counterclaim or an opportunity to defend against it; that it was denied its right to a jury trial; and that, in any event, Century and PSE failed to prove fraud. On this incomplete record on the fraud issue, we are not able to review the sufficiency of the evidence. Instead, we conclude that, although the court properly granted leave to amend, it reversibly erred by entering judgment on that new claim without re-opening the case to allow Triad to defend against it, including before a jury.

1.

At the close of Triad's Phase II case-in-chief, Century partially moved orally for leave to add a counterclaim for fraud and punitive damages (it stated that the written motion would be filed in a few days); Triad objected; and Century did not then obtain a ruling on the "motion". And, PSE and Century rested the next day, without presenting any evidence of fraud.

In fact, Century and PSE did not file the motion to amend until approximately three weeks after the conclusion of the Phase II trial. In opposition, Triad asserted that, if the court were to

grant leave to amend, Triad would be entitled to a continuance, to have some of the court's prior findings stricken, and to have the issues tried before a jury.  Nearly one and one-half years later, the district court granted leave to add the claim, one day before entering judgment.

The motion to amend was premised on FED. R. CIV. P. 13(f) and 15(b).  Rule 13(f) provides:

> When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, *or when justice requires*, the pleader may by leave of court set up the counterclaim by amendment.

(Emphasis added.)  Rule 15(b) provides:

> When issues *not raised by the pleadings* are tried by express or *implied consent* of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, *even after judgment*; but failure so to amend does not affect the result of the trial of these issues.  If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. *The court may grant a continuance to enable the objecting party to meet such evidence*.

- 30 -

(Emphasis added.) It goes without saying that the fraud claim was not tried by express consent. Triad contends that it did not receive adequate notice of the claim, and that it was not tried by implied consent.

We review the leave to amend ruling for abuse of discretion. *E.g.*, **Norman v. Apache Corp.**, 19 F.3d 1017, 1021 (5th Cir. 1994). Concomitantly, it is most obvious that, "under Rules 15(a) and 13(f) the Court should not grant leave to amend (or to add a counterclaim) where undue prejudice will result". **T. J. Stevenson & Co., Inc. v. 81,193 Bags of Flour**, 629 F.2d 338, 369-70 (5th Cir. 1980). For our purposes, "it is not often that amendments are allowed *after the close of evidence*, since the opposing party may be deprived of a fair opportunity to defend and to offer any additional evidence". **Id.** at 370 (emphasis added; internal quotation marks, ellipses, brackets, and citations omitted).

Consistent with what the district court held, Century and PSE assert that Triad cannot claim prejudice because Century and PSE's Phase II pretrial order inserts (filed less than two weeks before that part of trial) put Triad on notice that they were presenting a fraud claim, and because the evidence of fraud came "[f]rom the mouths of Triad's own witnesses".

The district court's conclusion that the pretrial order gave Triad notice is based on two statements placed in that order by Century and PSE: in the "Procedural History" portion, that "Triad,

at best, <u>misconstrued</u>, and at worst, <u>misrepresented</u>, that the drawings issued by PSE after Triad was awarded the Subcontract resulted in changes to Triad's contractual scope of work"; and, in the "Conclusion", that "[t]he evidence at trial will show that Triad's claims for ... EWOs were greatly overstated due to Triad's misrepresentation (whether intentional or not) of its contractual scope of work."

In the light of the particularity required for pleading fraud, FED. R. CIV. P. 9(b), and based on our review of this record, we conclude that, despite the on-the-scene familiarity by the district court with this question and, in the larger sense, this case, it erred by finding that the pretrial order put Triad on notice of a fraud claim. As noted, the statements that supposedly did so appear only in the "Procedural History" and "Conclusion" portions; those portions entitled "Contested Issues of Fact" and "Contested Propositions of Law" contain no mention of fraud. Moreover, in the pretrial order, PSE did not seek affirmative relief, and Century's refund claim is not couched as one for fraud:

> Triad's EWO submissions were flawed because they were based upon an incorrect conception of Triad's contractual scope of work. Both PSE and Century informed Triad on numerous occasions that its EWO submissions were flawed, but they accommodated Triad by making the interim payments....

Likewise, Century's claim for return of the $372,338 acceleration payment was based on a theory of unjust enrichment, not fraud:

> Since ... Triad did not properly comprehend or bid the correct scope of work, the fundamental premise on which the July 15th [acceleration] Agreement was based is invalid. Having lost the original estimate Triad can never meet its burden of proof.... Under these circumstances, Triad, as a matter of law, can recover nothing under the July 15th [acceleration] Agreement ... and Triad must repay to Century the sum of $372,338 originally advanced.... To hold otherwise would permit Triad to profit from its own mistakes and wrongful conduct.

Of course, charging willful and malicious conduct in breach of contractual obligations, without more, does not constitute a fraud claim. *See **Kingsley v. Baker/Beech-Nut Corp.***, 546 F.2d 1136, 1142 (5th Cir. 1977). In sum, these pretrial order statements do not constitute notice that Century and PSE were making a fraud claim. Along that line, it is most inconsistent, if not disingenuous, for Century and PSE to contend now that these statements put Triad on notice of a fraud claim; at trial, when Century "moved" orally for leave to amend, it stated that it had not done so earlier because it had not become aware of the fraud until near the end of the Phase II trial, because Triad had concealed it. Simply put, it would hardly be fair to hold that Triad should have recognized a fraud claim from the pretrial order statements, but yet allow the parties who made them to excuse their failure to seek leave to amend prior to trial by claiming ignorance of the fraud. *See **Jimenez v. Tuna Vessel Granada***, 652 F. 2d 415, 420 (5th Cir. 1981) ("each party is entitled to know what is being tried, or at least to the means to find out. Notice remains a first-reader element of

procedural due process, and trial by ambush is no more favored here than elsewhere.").

Pursuant to Rule 15(b), if "issues not raised by the pleadings" -- the equivalent of "notice" -- are tried instead by "express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."  No notice was given; nor was there express consent.  Therefore, a ruling on the new claim was allowable only if Triad had impliedly consented to trial of the fraud claims.  Toward that end, "trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b), [and] such inferences are to be viewed on a case-by-case basis and in light of the notice demands of procedural due process".  *Jimenez*, 652 F.2d at 422.

> Whether an issue has been tried with the implied consent of the parties depends upon whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond....  Whether the parties recognized that the unpleaded issue entered the case at trial often depends on whether the evidence that supports the unpleaded issue is also relevant to another issue in the case.  If the evidence that supports the unpleaded issue is also relevant to another issue in the case, the introduction of this evidence may not be used to show consent to trial of a new issue absent a clear indication that the party who introduced the evidence was attempting to raise a new issue.

*United States v. Shanbaum*, 10 F.3d 305, 312-13 (5th Cir. 1994) (internal quotation marks and citations omitted).

The evidence of fraud, and its active concealment, that the district court found came "from the mouths of Triad's own witnesses" was also relevant to the contractual issues being tried in Phase II. Because there was no indication that Century and PSE were presenting a fraud claim at the time that evidence was introduced, it cannot be the basis for finding that Triad impliedly consented to trial of a fraud claim.

Century and PSE respond that, because the "motion" to amend was made at the close of Triad's case and before they presented any evidence, Triad received fair notice of the claim, and its conduct thereafter amounted to a waiver of any right to complain. They maintain that Triad responded to Century's oral "motion" with a "half-hearted" objection; note that Triad never obtained a ruling on that objection, even when reminded at the conclusion of trial that the motion to amend was pending; and note that, during the balance of trial (one day), Triad did not, in its rebuttal case, present evidence relating to the fraud claim, nor seek a continuance to be allowed to do so, nor renew its objection or seek to reopen the case when reminded at the conclusion of trial that PSE and Century were pursuing a fraud claim.

As a point of embarkation, and as referenced earlier, it is most debatable that, when Triad rested, Century even "moved" orally

for leave to amend.  The comments by Century's counsel, taken as a whole, instead put the district court and Triad on notice that a motion *would be filed* in the near future.  This lack of certainty as to what was being sought cannot be laid at Triad's feet.

In any event, Century and PSE's reliance on *Dale Benz, Inc., Contractors v. American Casualty Co.*, 305 F.2d 641, 642 (9th Cir. 1962), in support of their assertion that Triad waived its right to complain about the fraud judgment by failing to obtain a ruling on its objection to Century's oral motion for leave to amend, made prior to the close of all the evidence, is misplaced; that case dealt with a party's failure to obtain a ruling on its objection to the admissibility of evidence.  In the absence of a ruling granting leave to amend, which was the responsibility of Century and PSE to obtain, Triad's failure to obtain a ruling on its objection to the proposed amendment cannot constitute a waiver of its objection to trial of a fraud claim that was merely proposed, but had not been allowed.  And, because Century and PSE did not obtain a ruling on the "motion", it would have been most premature for Triad to seek a continuance in order to introduce evidence on the fraud issue.

As Triad correctly notes, acceptance of the position advanced by PSE and Century would create a classic "Catch-22" for a party faced with an opponent's oral, ungranted, mid-trial (arguably, late-trial) motion for leave to add a claim.  Failure to defend the proposed claim during the remainder of trial would risk an order,

- 36 -

after both sides had rested, granting leave to file the claim and a finding that the non-movant had waived any objection by failing to defend. On the other hand, introducing evidence in opposition to the proposed claim would risk a finding, after the close of evidence, that leave to file should be granted pursuant to Rule 15(b) because the claim had been tried with the non-movant's implied, if not express, consent.

Triad was also prejudiced by the district court's exclusion during Phase II of evidence which, had Triad and the court been on notice that a fraud claim was being tried, would have been relevant to the elements required to prove fraud, such as whether Triad intended to defraud, whether PSE and Century relied on Triad's representations, and whether either suffered damages. For example, Triad sought to introduce evidence that it reduced its final price after Century instructed it to exclude work shown in post-1983 design documents and assured it that the post-1983 design changes would be handled as extras; evidence relating to Century's in-house estimate for the electrical and instrumentation portion of the project, which was lower than Triad's estimate of 83,000 man-hours; evidence of the parties' subjective intent and knowledge of Triad's scope; and evidence that Century was paid by PSE for Triad's extra work, as guaranteed maximum changes, while Century was claiming a refund from Triad for the same work. And "last but certainly not least", Triad was deprived of the opportunity to defend against the

punitive damages demand. *See* **Northeast Women's Center, Inc. v. McMonagle**, 868 F.2d 1342, 1356 (3d Cir.) (punitive damages award set aside where plaintiff failed to mention punitive damages in pretrial order and then objected to evidence of defendant's motive, thereby preventing defendant from defending the claim), *cert. denied*, 493 U.S. 901 (1989).

In sum, and based on our review of this record, we conclude that, pursuant to Rule 13(f) ("when justice requires"), allowing the addition of the fraud claim was not an abuse of discretion. *See* **Spartan Grain & Mill Co. v. Ayers**, 517 F.2d 214, 220 (5th Cir. 1975) (courts have interpreted provisions of Rule 13(f) liberally, in line with Rules' goal of resolving disputes on the merits in a single judicial proceeding); **Budd Co. v. Travelers Indem. Co.**, 820 F.2d 787, 791 (6th Cir. 1987) (internal quotation marks and citation omitted) ("Rule 13(f) permitting amendments `when justice requires' is especially flexible and enables the court to exercise its discretion and permit amendment whenever it seems desirable to do so."). Concomitantly, we conclude that the district court erred, after granting leave to amend, by ruling on the claim without reopening the case to allow Triad to defend against it. Accordingly, we must remand this case for further proceedings on the fraud claim.

For remand purposes, and contrary to Century and PSE's assertions, the district court did not hold that Triad was required

to return the $372,338 acceleration agreement ¶ 1 advance on a ground independent of its fraud finding.  PSE's *only* affirmative claim for relief is the fraud claim.  Likewise, in its initial counterclaim, Century sought to recover *only* alleged overpayments on Triad's EWOs; it did not demand payment under the acceleration agreement.  In the joint pretrial order filed by Century and PSE prior to the Phase II trial, they asserted that Triad "must repay to Century" the acceleration agreement ¶ 1 payment to Triad of $372,338, because Triad had lost its original estimate and, therefore, could not prove the number of additional man-hours caused by inefficiencies, as opposed to the number of man-hours resulting from Triad's underestimating the number of man-hours necessary to perform its contractual scope of work.  But, they neither sought nor obtained a ruling from the district court on that claim.  Instead, they sought and received the award based solely on their subsequent joint fraud claim.

2.

Also at issue is whether Triad was erroneously denied a jury trial of the fraud claim. Although remand is mandated by our holding that Triad was deprived of the right to defend against the properly allowed fraud claim, we address this issue to assist the district court on remand, in that the reasons advanced previously for not allowing a jury trial might be reurged, erroneously, on remand.

A party may demand a jury trial of any issue triable of right by a jury by serving upon the other parties a written demand "not later than 10 days after the service of the last pleading directed to such issue." FED. R. CIV. P. 38(b). The district court held that Triad was not entitled to a jury because the counterclaim did not raise new issues of fact, but only a new theory of recovery arising out of the same "circumstances and events" as Triad's claims for extras, for which it had not demanded a jury.

Concerning PSE, the new claim raised new issues of fact and law (such as fraud and PSE's damages) for which Triad had a right to a jury; PSE had never before asserted any claim. Likewise, in regard to Century, the claim raised new issues; for example, whether punitive damages should be assessed against Triad. Triad was entitled to demand a jury trial. *See* ***Daniel Int'l Corp. v. Fischbach & Moore, Inc.***, 916 F.2d 1061, 1064 (5th Cir. 1990).

Maintaining that "the issue of Triad's fraud had been in the case at least since the pretrial order", Century and PSE apparently contend that the Rule 38(d) 10-day period for a jury demand began to run from the date of that order. But, as stated, that order (even assuming that such an order is the Rule 38(d) operative "pleading") did not give notice of a fraud claim. Moreover, as also stated, if Century and PSE were aware of the facts giving rise to a fraud claim at the time of that order, there was no excuse for their waiting until much later in Phase II to move to amend.

Century and PSE assert also that Triad waived a jury by failing to request one after Century "moved" for leave to amend at the conclusion of Triad's Phase II case-in-chief. But, as also discussed, even assuming *arguendo* that Century did so move at that time, because Century and PSE did not then obtain a ruling on the motion, it would have been premature for Triad to have then requested a jury.

When all is said and done, this fraud claim is a classic example of one requiring full notice and opportunity for defense, to include a jury if desired. As noted, fraud commands its own rule of pleading, requiring more pleading detail than normally required. FED. R. CIV. P. 9(b) ("In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity.") And, surely, a fraud claim presents credibility and other fact-based questions that are most appropriate subjects for a jury. On the other hand, we are most mindful of the considerable time and attention already given this claim by the district court. But, on this record, Triad is entitled to now defend fully against this new claim, including, if desired, before a jury.

D.

PSE does not appeal the denial of attorney's fees; Century does. It requested them pursuant to, *inter alia*, TEX. CIV. PRAC. &

REM. CODE ANN. § 38.001, *et seq.* Here, § 38.001 is the only basis presented.

"The requisites to recover for attorney's fees under [that] statute ... are: 1) recovery of a valid claim in a suit on an oral or written contract; 2) representation by an attorney; 3) presentment of the claim to the opposing party or a representative of the opposing party; and 4) failure of the opposing party to tender payment of the just amount owed before the expiration of thirty days from the day of presentment." *Sikes v. Zuloaga*, 830 S.W.2d 752, 753 & n.1 (Tex. App. -- Austin 1992, no writ). The party seeking attorney's fees must both "plead and prove that presentment of a contract claim was made to the opposing party and that the party failed to tender performance." *Ellis v. Waldrop*, 656 S.W.2d 902, 905 (Tex. 1983).

Among other reasons for denying the § 38.001-request, the district court stated that, although Century "arguably" could recover, it had failed, contrary to that section, to properly allege in its pleadings both that a "demand" had been made on Triad, and that Triad, in turn, had failed to tender performance. We review the denial of attorney's fees for abuse of discretion. *E.g.*, *Richter, S.A. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 939 F.2d 1176, 1195 (5th Cir. 1991).

Century asserts that the allegation in its counterclaim that it told Triad that Triad had been overpaid, and Triad's admission

in its reply to the counterclaim that Century made such a statement, is adequate to plead a demand. Century maintains that it was not necessary to plead Triad's failure to tender performance because it is implicit from its counterclaim that Triad refused to tender the amount Century claimed owed. We disagree. As the district court held, Century's counterclaim did not give Triad the requisite notice that attorney's fees were being sought pursuant to § 38.001.

### III.

On remand, the trial of the fraud claim will, no doubt, be hotly contested and otherwise quite interesting, to say the least. One example of the potent ingredients comprising the mix for this issue is Triad's original bid estimate file, already the subject of extensive discussion, consideration, and district court rulings. Concerning that file, some might say, to borrow a phrase, that it "once was lost but now [is] found"; but, whatever may unfold, we are most confident that, on remand, our very able district court colleague will dispatch this, as well as the other issues, carefully and expeditiously.

In sum, the denial of attorney's fees is **AFFIRMED**; those parts of the judgment disallowing Triad's claims and awarding $593,215 to Century are **AFFIRMED**; those parts concerning the joint fraud counterclaim, awarding $372,338 in actual damages and $3 million in

punitive damages, are **REVERSED**; and the case is **REMANDED** for further proceedings consistent with this opinion.

*AFFIRMED in PART and REVERSED and REMANDED in PART*