KESSMANN AND ASSOCIATES,
INC., Plaintiff,

v.

BARTON–ASCHMAN ASSOCIATES, INC.
A/K/A Parsons Transportation Group,
Inc., Defendants.

No. Civ.A. H–97–1893.

United States District Court,
S.D. Texas,
Houston Division.

Nov. 5, 1997.

Patrick Andrew Zummo, Zummo & Perry, Houston, TX, Delia M. Stephens, Houston, TX, for Plaintiff.

C. Mark Baker, Fulbright & Jaworski, Houston, TX, for defendant.

## MEMORANDUM AND ORDER

ATLAS, District Judge.

This dispute centers around certain agreements between Kessmann and Associates, Inc. ("Plaintiff") and Parsons Transportation Group, Inc. ("Defendant") regarding the performance by Plaintiff of technical services for Defendant, in partial fulfillment of Defendant's contractual obligations to the Nevada Department of Transportation ("NDOT") to upgrade NDOT's traffic computer systems in Las Vegas and Henderson, Nevada. NDOT hired Defendant as the technical consultant to design the upgraded traffic computer system, and Defendant subsequently hired Plaintiff as its subconsultant on certain technical matters. Plaintiff has alleged various

wrongs committed by Defendant during the course of the parties' business relationship. Defendant has responded, filing a Motion to Dismiss [Doc. # 6] and Supplemental Motion to Dismiss [Doc. # 14] ("Defendant's Motions"), supported by its Memorandum of Law [Doc. # 7] ("Defendant's Memorandum"), and Memorandum of Law in Support of Supplemental Motion to Dismiss [Doc. # 15] ("Defendant's Supplemental Memorandum"). Plaintiff opposes these Motions. See Plaintiff's Response to Defendant's Original and Supplemental Motions to Dismiss [Doc. # 34] ("Plaintiff's Response"). Because the Court finds that Plaintiff has pursued its claims in an improper venue, the Court concludes that Defendant's Motions should be granted.

## I. FACTUAL BACKGROUND

In 1993, Defendant bid on a job to upgrade the Las Vegas Area Traffic Computer System ("LVACTS").[1] On September 7, 1993, Defendant entered into an "Agreement for Engineering Services" with NDOT ("NDOT contract") to provide the engineering services necessary to upgrade the LVACTS system.[2] Defendant entered into a subcontract entitled "Nevada Department of Transportation, Subconsultant Contract, Agreement for Technical Services" ("1993 subcontract") with Plaintiff on September 8, 1993 to provide traffic signal computer systems expertise for the design of the traffic signal system upgrade for the LVACTS.[3] The 1993 subcon-

---

1. The LVACTS apparently is the traffic signal system for the City of Las Vegas, City of North Las Vegas, Clark County, NDOT, City of Henderson, and the Regional Transportation System. See First Amended Complaint [Doc. # 32] ("Complaint"), ¶ 1.

2. See Agreement for Engineering Services (Exhibit B to Defendant's Memorandum) ("NDOT contract"). Plaintiff apparently had formulated and presented a technical demonstration to the LVACTS selection committee. See Complaint, ¶ 9. Plaintiff alleges that this presentation "resulted in Defendant being selected to do the feasibility study project 'LVACTS Upgrade Alternatives.'" Id.

3. Plaintiff's responsibilities in this regard were to provide the design concepts and ideas for local controllers hardware and software, input on communications software, and system control

logic. See generally Nevada Department of Transportation, Subconsultant Contract, Agreement for Technical Services (Exhibit A to Defendant's Memorandum) ("1993 subcontract"), Arts. I & II. Defendant was responsible for the remainder of the project design, project management, and project equipment procurement, and also included the communications network design concepts. See Complaint, ¶ 10.

The subcontract apparently was amended twice. On September 1, 1994, Plaintiff agreed to provide additional consulting services for the development of system software, see Amendment to Agreement (Exhibit C to Defendant's Memorandum) ("Amendment # 1"), but Defendant insisted that Plaintiff's fees for this new work be reduced from what Plaintiff had originally quoted to do such additional work prior to the subcontract. On June 23, 1995, the City of Henderson, Nevada, joined the

tract contemplated that Plaintiff's work product would become the property of NDOT after completion of the project, and would eventually be placed in the public domain. *See* NDOT contract, at 10, ¶ 2; Amendment # 1, at 2. Plaintiff was involved directly with NDOT during the bidding and demonstration process. *See* ·Complaint, ¶ 9.

Plaintiff delivered source code and design documents to the LVACTS and Defendant in November 1995. Plaintiff alleges that the communications software could not be completed because Defendant never supplied Plaintiff with the necessary communications computers and equipment. *See* Complaint, ¶ 12. Plaintiff also alleges that Defendant failed to provide other additional equipment required for completion and testing of the developed software until May 1996. Plaintiff continued to perform services pursuant to the original 1993 subcontract and its amendments. Defendant allegedly refused to pay Plaintiff $97,500 for out-of-scope work, refused to pay $55,102.00 held by Defendant remaining in Plaintiff's allocated fees, and further refused to pay Plaintiff $17,775.00 held by Defendant as retainage on the 1993 subcontract as amended. *See id.*, ¶ 12. According to Plaintiff, "[t]he contract ended September 30, 1996." *Id.*, ¶ 12.

> LVACTS and its traffic signals were added to the project. According to Plaintiff, only minimal additional funds were allocated to Plaintiff to provide these services. *See* Complaint, ¶ 11.

4. According to Plaintiff, these individuals "at all times material to this lawsuit were acting within the scope of their employment, in a managerial position, with authorization from Defendant" and their actions were ratified by Defendant. Complaint, ¶ 17.

5. These abuses included: restricting Plaintiff's interactions with the LVACTS users; refusing to apprise NDOT of the status of software developments costs; refusing to request additional compensation for out-of-scope work performed by Plaintiff while insisting that Plaintiff complete the software regardless of cost; prohibiting the LVACTS personnel from viewing the developed local controller software running in Plaintiff's office; redesigning the communications system network without Plaintiff's input or involvement; failing to return Plaintiff's phone calls or requests for meetings; failing to develop programming requirements; failing to specify, order, or deliver the hub computer required for completion of the communications network; insisting

Plaintiff alleges that as early as September 1993, "certain employees of Defendant began a subversive pattern of sabotage of Plaintiff's work on the LVACTS upgrade project, misappropriation of Plaintiff's work for use by Plaintiff's competitors, and destruction of Plaintiff's business relationship with Defendant and other businesses and agencies in the transportation industry."[4] *Id.*, ¶ 17. According to Plaintiff, a new project manager, Richard Denney ("Denney") committed various breaches and other abuses of the 1993 subcontract.[5] In July 1996, Denney began working for the Viggen Corporation ("Viggen"), an eventual competitor of Plaintiff for certain services.[6] *See id.* ¶ 17.

Plaintiff further alleges that on May 9, 1996, the LVACTS decided to modify the originally intended communications properties and incorporate the National Transportation Communications for Intelligent Transportation Systems Protocol ("NTCIP") into the upgrade system. Plaintiff wished to provide these additional services for additional compensation. *See* Complaint, ¶ 13.

Thereafter, on September 11, 18, and 23, 1996 and November 18, 1996, Plaintiff submitted proposals that, according to Plaintiff, formed the basis of a *new* agreement with Defendant to provide professional services for the completion of the system.[7] These

> that Plaintiff's work could be used by other consultants in competition with Plaintiff; having Plaintiff eliminated from certain projects; and limiting Plaintiff's participation in additional ventures with Defendant. Denney allegedly also attempted to delay Plaintiff's work on the project. *See* Complaint, ¶ 17.

6. Upon Denney's departure from Defendant, Plaintiff alleges that certain documents previously sent to Defendant for review and distribution disappeared. *See id,* ¶ 17.

7. It is unclear how the parties conceive of their continuing relationship, and the relevant agreements between them. In its Complaint, Plaintiff argues that two separate subcontracts were created by the parties. According to Plaintiff, the new agreement was intended to be codified as an amendment to the 1993 subcontract, but negotiations fell through. *See* Affidavit of Roy Kessmann (Exhibit A to Plaintiff's Response), at 1–2. Plaintiff's explanation of these two subcontracts, and the relationship between them, however, is ambiguous. Defendant apparently does not share this view of the parties' relations, but never

services, as described by Plaintiff, included converting the completed local controller software to a new, not-yet-manufactured local controller, enhancing considerably the local controller software, and the NTCIP. *See* Complaint, ¶ 14. Plaintiff claims that Defendant accepted the proposals, and encouraged Plaintiff to conduct the work "under verbal authorization" in order to meet a short deadline. *Id.* Plaintiff contends that after it had begun work under this "new subcontractual agreement" ("1996 agreement") on October 1, 1996,[8] Defendant altered its expectations and Plaintiff's obligations several times. On September 17, 1996, Defendant allegedly directed Plaintiff to revise its quote for the NTCIP from $346,175 to $300,000. On September 18, 1996, Defendant instructed Plaintiff to reduce its quote for project completion beyond the NTCIP from $132,500 to $107,250. Finally, on September 20, 1996 Plaintiff's fee for work was set at $407,616.[9] *See id.,* ¶ 15.

In November 1996, the LVACTS allegedly requested that still more capabilities be added to the local controller software, which Plaintiff claims had not been contemplated in Plaintiff's previous proposals forming the basis of the alleged 1996 agreement (or any extension of the 1993 subcontract). These new capabilities allegedly required significant modifications to both the local controller software and the central software system. Defendant allegedly instructed Plaintiff to provide these additional services, but did not allocate additional monies to fund Plaintiff's work. Plaintiff therefore made the enhancements—which included enhancements in both the local controller software and the central system software—at its own expense and delivered these enhancements to the LVACTS and Defendant in February and April 1997. *See* Complaint, ¶ 16.

During the negotiations for and eventual performance of the services performed in 1996, Defendant's abuses allegedly continued.[10] According to Plaintiff, it "delivered

---

addresses Plaintiff's allegations of two discreet subcontracts. The record before the Court, however, is simply too ambiguous to determine definitively the nature or terms of the 1996 relationship between the parties. At any rate, all agreements relate to and arise out of the original NDOT contract and the work performed pursuant to it. The Court therefore does not reach the issue of whether the 1996 work by Plaintiff was governed by terms of the 1993 subcontract. This issue is inextricably intertwined with resolution of the merits of Plaintiff's claims, many, if not all of which, involve the 1993 subcontract.

8. According to Plaintiff, although the parties began negotiating in August 1996 for a more formal, written contract representing this phase of the project, "[p]laintiff's proposals ... were as formal as the parties' agreement ever became for this work." Complaint, ¶ 14.

9. Plaintiff alleges that during this period of negotiations, the only representative of NDOT with whom Plaintiff was allowed to communicate was an individual hired by Defendant who had previously worked for the State of Nevada. This individual was the decisionmaker during the meeting in which Plaintiff's fees were finally established. *See* Complaint, ¶ 15.

10. Plaintiff claims that Denney pursued the NTCIP services for his new employer Viggen, representing that Plaintiff would not be able to meet the schedule for completion. *See* Complaint, ¶ 17. Defendant's new project manager, Curtis Herrick ("Herrick") subsequently solicited a proposal from Viggen for the NTCIP work after

Plaintiff informed him that it did not require assistance from Viggen to complete the work timely. Herrick and his supervisor, Gary Jost ("Jost") then attempted to hold a closed meeting with the Operations Management Committee of the LVACTS with the alleged purpose of promoting Viggen for the NTCIP portion of the project. Herrick and Jost at that time both allegedly stated that Viggen could use the software developed by Plaintiff. *See* Complaint, ¶ 18. *See id.,* ¶ 18. This pattern continued after the 1996 agreement proposals were accepted. Plaintiff alleges that Herrick continued to urge that software was on the critical path, but refused to deliver to Plaintiff the hardware necessary for software development, testing, and completion. Plaintiff further alleges that Herrick intentionally attempted to delay Plaintiff's work on the project through his actions and omissions: he continued to expand the scope of Plaintiff's work without providing additional compensation; refused to enter into a more formal written contract for the work, even after signing a new contract with NDOT in December 1996; and marked Plaintiff's invoices "hold" or "disputed." *See* Complaint, ¶ 19. Thereafter, Herrick followed Denney, leaving Defendant and going to work for Viggen. *See id.,* ¶ 20. Plaintiff further contends that upon Herrick's departure, Defendant's alleged misconduct was continued by Jost. Plaintiff asserts that Jost has failed to deliver the necessary hub computer to Plaintiff while informing NDOT that Plaintiff's work could proceed without it; has made no effort to enter into a written contract with Plaintiff regarding the 1996 agreement; has imposed unreasonable requirements and terms on Plain-

completed enhanced executable software for both the local controllers and central system throughout April and early May 1997, thus meeting and surpassing all of [Defendant's] illogical, inconsistent, and unreasonable delivery demands." *Id.,* ¶ 20. Plaintiff alleges that on May 15, 1997, Defendant terminated Plaintiff's contract without just cause, and that the "software delivered is not finished because of Defendant's breach of contract as stated above." *Id.* In contrast, Defendant's account of the events leading to this lawsuit are that "Kessmann was unable to meet NDOT deadlines, unable to provide a functioning product yet demanded full payment for the unfinished computer system, as well as for unauthorized out-of-scope work. Therefore, Kessmann was terminated from any further involvement in the LVACTS upgrade project." Defendant's Supplemental Memorandum, at 2.

Plaintiff filed this lawsuit on May 5, 1997 based on diversity of citizenship.[11] Plaintiff alleges claims for: breach of contract based on the 1993 subcontract and 1996 agreement; quantum meruit; breach of good faith and fair dealing;[12] copyright infringement and unfair competition; fraud, deceit, and mis-

representation; and also seeks declaratory and injunctive relief.[13] Defendant has responded, filing a Motion to Dismiss based on, *inter alia,*[14] improper venue. *See* Fed. R.Civ.P. 12(b)(3). Because the Court finds that venue in this case is predetermined by a forum-selection clause incorporated into the parties' agreements, for the reasons stated below, Defendant's Motions are GRANTED based on improper venue, and the Court does not reach Defendant's additional defenses.

## II. *ILLEGAL STANDARDS*

### A. *Forum Selection Clauses*

Parties may designate by contract a forum in which any litigation is to take place. Any lawsuit commenced elsewhere may then be subject to dismissal for improper venue. *See Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991); DAVID HITTNER, FEDERAL CIVIL PROCEDURE BEFORE TRIAL, 5TH CIRCUIT EDITION § 4:34, at 4–7 (1996). The law favors forum-selection clauses. *See Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 32, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988) (Kennedy,

tiff; has continued to demand work outside the scope of the 1996 agreement with no additional compensation; has led Plaintiff to believe that Defendant will only sign a formal contract that allows other consultants to use Plaintiff's work in competition with Plaintiff; has refused to pay timely Plaintiff's invoices or advise Plaintiff of invoice submittal dates; has failed to release a hold on an invoice paid by NDOT; and has refused to develop a reasonable delivery schedule and implementation plan with Plaintiff for Plaintiff's deliverables. *See* Complaint, ¶ 20.

**11.** The current amount in controversy requirement is $75,000. *See* 28 U.S.C.A. § 1332(a) (West Supp.1997). This amendment to the Code took effect 90 days after its enactment on October 19, 1996. *See* Federal Courts Improvement Act of 1996, Pub.L. No. 104–317, § 205, 110 Stat. 3847, 3850 (1996) (codified at 28 U.S.C. § 1332). Although Plaintiff only alleged that the amount in controversy exceeds $50,000, *see* Complaint, ¶ 2, Plaintiff has alleged damages in its Complaint considerably in excess of the $75,-000 requirement.

**12.** Plaintiff concedes that even if the Court were to deny the Motions to Dismiss and invoke jurisdiction over this claim, recent Texas Supreme Court precedent likely will undermine this claim. *See Formosa Plastics Corp. v. Presidio Engineers*

*and Contractors, Inc.,* No. 95–1291, 1997 WL 378129, 40 Tex.Sup.Ct.J. 877 (Tex. July 9, 1997), *pet. for reh'g of application for writ of error filed,* (Tex. July 23, 1997) (holding that there is no general duty of good faith and fair dealing in contractual relationship between an owner and prime contractor).

**13.** Although Plaintiff has requested injunctive relief in order to avoid "irreparable injury," the merits are closely intertwined with the requested relief, and the Court therefore finds that given its disposition of Defendant's Motions, making a determination on this issue would be inappropriate. Further, Plaintiff can seek relief in Nevada under the provisions of the 1993 subcontract.

**14.** Defendant's other defenses include: absence and inability to join an indispensable party mandating that the action be dismissed in equity and good conscience, *see* Fed.R.Civ.P. 12(b)(7), 19(a), 19(b); lack of subject matter jurisdiction, *see* Fed.R.Civ.P. 12(b)(1); and failure to state a claim upon which relief can be granted, *see* Fed. R.Civ.P.12(b)(6). Regarding these other defenses, the Court notes that indispensable party analysis is neither directly dispositive nor applicable. The Court's venue analysis adequately addresses all of Plaintiff's claims, and moots consideration of Defendant's additional defenses.

J., concurring) (valid forum-selection clauses must receive controlling consideration "in all but the most exceptional cases"). They are considered "prima facie valid and should be enforced unless enforcement is shown to be 'unreasonable' under the circumstances." *International Software Systems, Inc. v. Amplicon, Inc.*, 77 F.3d 112, 114 (1996) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10, 92 S.Ct. 1907, 32 L.Ed.2d. 513 (1972)).

■ Courts thus generally enforce forum-selection clauses unless the nonmoving party clearly shows that "enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *The Bremen*, 407 U.S. at 15, 92 S.Ct. 1907. "Unreasonableness potentially exists where (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state." *See Haynsworth v. The Corporation*, 121 F.3d 956, 963 (5th Cir.1997) (quoting *Carnival Cruise Lines*, 499 U.S. at 595, 111 S.Ct. 1522); *The Bremen*, 407 U.S. at 12–13, 15, 18, 92 S.Ct. 1907.

■ Although "the serious inconvenience of the contractual forum to one or both of the parties might carry greater weight in determining the reasonableness of the forum clause," the party complaining inconvenience is required satisfy a "heavy burden of proof" in order to set the clause aside. *Carnival Cruise Lines*, 499 U.S. at 594–95, 111 S.Ct. 1522 (quoting *The Breman*, 407 U.S., at 17, 92 S.Ct. 1907). Litigation in the selected forum must be so "gravely difficult" that the party, for all practical purposes, will be deprived of its day in court. *The Breman*, 407 U.S. at 18, 92 S.Ct. 1907. Claims that arise out of the contractual relationship and implicate the agreement are subject to the forum-selection clause. *See Texas Source Group, Inc. v. CCH, Inc.*, 967 F.Supp.

234, 237 (S.D.Tex.1997); *Hoffman v. Burroughs Corp.*, 571 F.Supp. 545, 547 (N.D.Tex. 1982) (plaintiff's "claims for fraudulent inducement into contract and breach of warranties impliedly made upon entering an agreement are undoubtedly related to that agreement" and thus subject to the forum-selection clause).

### B. Procedure

■ Plaintiff argues that the Court must treat Defendant's Motions as summary judgment motions under Rule 12(b)(6) of the Federal Rules of Civil Procedure because Defendant relies on and has attached documents to its Memorandum that are not mentioned in the Plaintiff's Complaint, specifically, the contract between Defendant and NDOT. *See* Plaintiff's Response, at 4–6. It is undisputed that "no provision of the NDOT contract is mentioned in [Plaintiff's] complaint," Defendant's Memorandum, at 7–8, although Plaintiff does refer to the "base contract." *E.g.*, Complaint, ¶¶ 24, 29.

■ There is no question that whenever matters outside the pleadings are considered by the district court on a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the Court must treat the motion as one for summary judgment and dispose of it as required by Rule 56. *See, e.g., Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *Jackson v. Procunier*, 789 F.2d 307, 309 (5th Cir.1986). However, this rule applies only to Rule 12(b)(6) motions.

The reason for the exclusion of the other defenses listed in the subdivision is fairly clear. There never has been any serious doubt as to the availability of extra-pleading material on these motions. Moreover, the other Rule 12(b) defenses only challenge the propriety of the court adjudicating the claim before it and do not reach the validity of the claim itself. Since a motion for summary judgment is designed to test the merits of the claim, the defenses enumerated in Rule 12(b)(1) through Rule 12(b)(5) and Rule 12(b)(7) generally are not proper for motions for summary judgment.

5A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1366 (2d ed.1990); *see also id.* § 1364; *Estes v. Shell Oil Co.,* 234 F.2d 847, 849 (5th Cir.1956) (ruling of district court on motion to dismiss for failure to join indispensable parties was necessarily based upon allegations of complaint and affidavits and other proofs introduced in contradiction or support thereof). The Fifth Circuit has squarely held that the enforceability of a forum selection clause is a question of law. *See Mitsui & Co. (USA), Inc. v. Mira M/V,* 111 F.3d 33, 35 (5th Cir. 1997).[15] In any event, in reaching its conclusions regarding the forum selection clauses in issue, the Court perceives no genuine questions of material fact. Since the contracts are clear and straightforward, and must interpreted by their own terms.

## III. *DISCUSSION*

Defendant argues that this action should be dismissed pursuant to Fed.R.Civ.P. 12(b)(3) because it was brought in an improper venue. Defendant argues that the 1993 subcontract "Disputes" provision bars the filing of this lawsuit in this Court. Additionally, according to Defendant, the 1993 subcontract is a " 'pass-through' contract which mirrors [Defendant's] contract with NDOT and incorporates those contractual provisions into [Plaintiff's] contract." *See* Defendant's Memorandum, at 4, 5. Defendant maintains that Section 8 of the NDOT contract, which it contends is fully incorporated into the 1993 subcontract, contains a forum selection clause limiting any contractual dispute or complaint relating to the LVACTS upgrade to determination in Nevada, by means of either a hearing before NDOT or through the Nevada state courts. *Id.* at 19–21; Defendant's Re-

ply to Plaintiff's Response to Defendant's Original and Supplemental Motions to Dismiss, at 1–6 [Doc. # 35] ("Defendant's Reply").

Plaintiff counters that there is no forum selection or dispute process requirement applicable to its claims in this action.

### A. *Dispute Provisions in the 1993 Subcontract*

The "Disputes" provision in the 1993 subcontract provides as follows:

> ARTICLE XXV—DISPUTES: The SUBCONSULTANT [Plaintiff] shall be responsible for the settlement of all contractual and administrative issues arising out of procurements entered into in support of subcontract work.

> The [NDOT] shall act as referee in all disputes regarding nonprocurement issues, and NDOT's decisions shall be final and binding.

1993 subcontract, at 7. Defendant argues that this provision precludes Plaintiff from instituting this lawsuit in Texas federal court. Plaintiff disagrees and relies on a dubious interpretation of the clause and of the word "procurement" in the 1993 subcontract.[16]

 Plaintiff does not dispute that the plain language of the second sentence of the Disputes clause requires Plaintiff to submit its complaints under the 1993 subcontract to NDOT to act as the "referee" to the extent that the dispute involves "nonprocurement issues." Rather, Plaintiff relies on the first sentence of the subcontract Disputes clause quoted above, arguing that because Plaintiff's services are procured by Defendant under Plaintiff's contract with NDOT, all disputes

15. There is some question about whether motions to dismiss on the basis of forum selection clauses are properly brought as motions under Fed.R.Civ.P. 12(b)(1), 12(b)(3), or 12(b)(6), or 28 U.S.C. § 1406(a). *See, e.g., International Software Systems,* 77 F.3d at 114–15. This Court concludes that Rule 12(b)(3) is most appropriate, since the matter is one of private contract, not this Court's subject-matter jurisdiction, and the parties have not sought transfer per se. *See Albany Ins. Co. v. Almacenadora Somex, S.A.,* 5 F.3d 907, 909 n. 3 (5th Cir.1993) (treating motion as one under Rule 12(b)(3)); *see also International Software Systems,* 77 F.3d at 114–15 (holding that district court could dismiss, as op-

posed to transfer, case based solely on forum selection clause, where personal jurisdiction existed and venue was otherwise proper, using 28 U.S.C. § 1406(a)).

16. Plaintiff argues: "The dispute in this case goes to the very heart of the contract—payment for services rendered and technology supplied. These are the very items the contract procures. It thus seems elementary that the dispute in this case concerns a procurement issue, thereby falling outside [the disputes provision of the 1993 subcontract]." Plaintiff's Response, at 19.

that Plaintiff has with Defendant must be "procurement" related.

The Court is unpersuaded by Plaintiff's argument. The first sentence of the Disputes clause does not relate to forum or venue at all. On its face it is a risk allocation provision between Plaintiff and Defendant. The language to which Plaintiff refers makes Plaintiff responsible for resolving (*i.e.*, settling) all "contractual and "administrative" disputes concerning "procurements" "entered into in support of subcontract work." Since this clause is found in the contract between Plaintiff and Defendant, the language can only mean that Plaintiff agreed to be responsible for resolving all disputes with third parties in connection with Plaintiff's performance of the services called for in the subcontract; Plaintiff by this clause agrees to so resolve such disputes without Defendant's financial or other assistance. Under Plaintiff's construction, in contrast, Plaintiff unilaterally would be allowed to determine the outcome all disputes it had with Defendant. Thus, Plaintiff's interpretation that the first sentence of the "Disputes" clause in its 1993 subcontract with Defendant somehow means that Plaintiff retained the right to litigate its disputes with Defendant in court, rather than to use NDOT as a referee, is illogical.

 Plaintiff's complaints are essentially that (i) Defendant failed to pay for services rendered by Plaintiff, (ii) Defendant failed to provide the equipment and support necessary to Plaintiff's completion of performance of the subcontract or the tasks to which Plaintiff had agreed in 1996, and (iii) Defendant's former employees misappropriated Plaintiff's work or ideas. Each complaint relates to Plaintiff's performance of aspects of Defendant's NDOT contract. Plaintiff's claims here do not relate to Plaintiff's acquisition of services from third parties.

17. *See infra* discussion, at Part III.B.

18. Plaintiff's have pointed to no evidence supporting their construction of the Disputes provision. Even if they had, a party to a contract cannot alter the meaning of an unambiguous agreement with parol evidence. Further, even when parol evidence is admissible to clarify an ambiguity, such evidence is not competent to vary the terms of the contract or contradict the legal effect of its unambiguous provisions. *See*

 Finally, the subcontract Disputes provision must be construed in its entirety. The subcontract, entitled "Nevada Department of Transportation Subconsultant Contract," explicitly incorporated by reference all the NDOT/Defendant contract provisions.[17] Plaintiff's interpretation of its contract with Defendant is contrary to the language in the parties' agreement.[18] The parties are bound to the intent evidenced in their written agreement at the time of contracting. *See Mustang Tractor,* 76 F.3d at 91 ("Texas law requires that courts strive to effectuate the intentions of parties as they are expressed in a contract. Courts must read all provisions of an agreement together, interpreting the agreement so as to give each provision its intended effect. [Courts] must be particularly wary of isolating individual words, phrases, or clauses and reading them out of the context of the document as a whole.") (citations omitted).

**B.** *Incorporation of NDOT Provisions into 1993 Subcontract*

 The "Scope of Agreement" description in the parties' 1993 subcontract provides that the relationship between the parties "at all times ... shall be governed by and in strict compliance with the terms of [Defendant's] contract with [NDOT], a copy of which is attached to the Agreement as Attachment A and incorporated by reference." 1993 subcontract, Art. 1, at 1.

The disputed NDOT contract provision states:

Any dispute arising under this Agreement as to performance, compensation, and interpretation of satisfactory fulfillment of the terms of this Agreement shall be determined by the STATE. The STATE's decision may be appealed to the STATE's

*Triad Elec. & Controls, Inc. v. Power Sys. Engineering, Inc.,* 117 F.3d 180, 191 (5th Cir.1997); *Mustang Tractor & Equip. Co. v. Liberty Mut. Ins. Co.,* 76 F.3d 89, 91 (5th Cir.1996); *Constitution State Ins. Co. v. Iso–Tex Inc.,* 61 F.3d 405, 408 (5th Cir.1995); *Friendswood Development Co. v. McDade + Co.,* 926 S.W.2d 280, 282–83 (Tex. 1996); *National Union Fire Ins. Co. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995).

established Contract Claims Review Board; however, an appeal must be in writing and must be made within ten (10) working days of the date of the STATE's decision. Nothing herein contained shall impair the CONSULTANT's right to file suit in the courts of the State of Nevada. NDOT contract, § 8, at 12 ("Section 8"). Defendant argues that Section 8 is a forum-selection clause, that it was incorporated into the 1993 subcontract, and that it mandates dismissal of this action. Plaintiff disputes this contention.

 First, Plaintiff argues, it is undisputed that the 1993 subcontract did not mention the words "forum-selection" and that Section 8, if it in fact is a forum selection clause, is not applicable to the 1993 subcontract because it was not referred to expressly in the subcontract. This argument is unsupported by the record, as quoted above. The case law establishes that blanket incorporation by reference is generally effective to accomplish its intended purpose where the provisions to which reference is made have reasonably clear and ascertainable meanings. *Compare Gingiss Int'l, Inc. v. Bormet*, 58 F.3d 328, 331 (7th Cir.1995) (franchisees entered into two contracts with franchisor—one on behalf of themselves individually, and one on behalf of a corporation they owned; Seventh Circuit concluded that the individuals were bound personally by the arbitration clause contained within the contract between franchisor and franchisees' corporation because the individuals' contract incorporated the franchise agreement by reference and imposed all the obligations of that agreement), *U.S. Fidelity & Guar. Co.*, 837 F.2d at 1507–08; *and Exchange Mut. Ins. Co. v. Haskell Co.*, 742 F.2d 274 (6th Cir.1984), *with Grundstad v. Ritt*, 106 F.3d 201, 204 & n. 4 (7th Cir.1997) (while

a nonsignatory guarantor of an agreement containing an arbitration provision may be bound by the arbitration provision when the particular guaranty explicitly incorporates the underlying agreement by reference, contract in issue did not do so). Just as arbitration clauses have been held to be incorporated by reference into guarantees signed by parties other than the borrower and lender, the forum selection/dispute resolution clause in the NDOT contract was incorporated by reference into the parties' 1993 subcontract.

Plaintiff also asserts that forum selection and "disputes" clauses are not binding on subcontractors unless they are expressly made applicable in the subcontract. *See H.W. Caldwell & Son, Inc. v. U.S.*, 407 F.2d 21, 23 (5th Cir.1969); *United States v. Gulf Ins. Co.*, 650 F.Supp. 557, 558 (S.D.Fla.1986). As Defendant notes, however, the cases cited by Plaintiff are inapposite: they are Miller Act cases and represent the exception rather than the rule, because one of the contracting parties is the United States. *See J .S. & H. Construction Co. v. Richmond County Hosp. Auth.*, 473 F.2d 212, 215 (5th Cir.1973); *U.S. Fidelity & Guar. Co.*, 837 F.2d at 1508.[19]

Plaintiff also postulates in a similar but distinct argument that Section 8 was not incorporated into the 1993 subcontract at all. Plaintiff directs the Court to Section 9(H) in the NDOT contract, which states that other subsections of Section 9 must be incorporated by reference into subcontracts.[20] Plaintiff therefore argues that "[n]o other terms are expressly incorporated by reference into the subcontract, and no terms of the [NDOT] contract are expressly required to be incorporated by reference into subcontracts." *See* Plaintiff's Response, at 16. Plaintiff reasons that because the NDOT contract *requires*

19. The Miller Act, 40 U.S.C.A. § 270a *et seq.* (1997), governs disputes in which the federal government is the contract owner and hence the rights and remedies of the parties are limited. *See U.S. Fidelity & Guar. Co.*, 837 F.2d at 1508.

20. Section 9(H) states that "[Defendant] will include the provisions of Paragraphs (A) through (H) of this Section in every subcontract...." *See* NDOT contract, § 9(H), at 15. These subsections concern obligations upon the contractor (and thus by incorporation, the subcontractor), including that the contractor (and subcontractor) may not retain any patent and copyrights on the work performed under the NDOT (or related) contracts; that all parties must comply with all applicable federal and state nondiscrimination regulations; that all subcontractors must be notified by the contractor of the requirements of the contract under the NDOT contract and applicable regulations, that there are reporting and information requirements associated with the contract (and subcontracts); and that there will be sanctions for noncompliance with the nondiscrimination requirements.

certain provisions to be incorporated into subcontracts, those enumerated provisions are the only provisions that *can* be incorporated, and limits the terms that were incorporated into the 1993 subcontract to the exclusion of any other general provisions in the NDOT contract.

This argument flies in the face of Article I of the 1993 subcontract. Plaintiff agreed therein that at all times Plaintiff's relationship to Defendant "shall be governed by and in strict compliance with the terms" of the NDOT contract. *See* 1993 subcontract, Art. I, at 1. Given the unequivocal language in the parties' agreement, bargained for and signed by Plaintiff, the Court holds that the plain language of the 1993 subcontract contemplates the incorporation of all relevant terms from the NDOT contract. If it did not want to be bound to the Nevada forum, Plaintiff should have sought to alter this agreement when it was negotiating with the parties at the outset. Thus, this argument is without merit. Therefore, the Court rejects each version of Plaintiff's argument that the NDOT forum selection provision in Section 8 cannot apply because it was not expressly made applicable by or because it was not incorporated by explicit reference in the 1993 subcontract.

■ Finally, Plaintiff argues that Section 8 is not a forum selection clause. Plaintiff argues that in other cases, mere acknowledgment of jurisdiction in a forum did not mandate that all suits be brought there. *See John Boutari & Son v. Attiki Importers & Distributors, Inc.*, 22 F.3d 51, 53 (2d Cir. 1994) (citations omitted). According to Plaintiff, Section 8 is merely a declaration by the State of Nevada that it will submit to the jurisdiction of the Nevada Courts if sued there, rather than a mandatory forum selection clause. Defendant counters that the use of the word "shall" generally indicates mandatory intent, *see Milk 'N' More, Inc. v. Beavert*, 963 F.2d 1342, 1345–46 (10th Cir. 1992), and that therefore Section 8 is "far from permissive, and requires the dismissal of this action." Defendant's Reply, at 6.

■ It is true that "[a]n agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere." *John Boutari & Son*, 22 F.3d at 53. However, the Court finds and concludes that Section 8 contemplates something more than a permissive forum. *Compare Keaty v. Freeport Indonesia, Inc.*, 503 F.2d 955, 957 (5th Cir.1974) ("This agreement shall be construed and enforced according to the law of the State of New York and the parties submit to the jurisdiction of the Courts of New York," held permissive), *with Kevlin Services, Inc. v. Lexington State Bank*, 46 F.3d 13, 14 (5th Cir.1995) ("This contract shall be interpreted and construed in accordance with the laws of the State of Texas. The legal venue of this contract and any disputes arising from it shall be settled in Dallas County, Texas," held mandatory). In the case at bar, the provision in issue provides:

> Any dispute arising under this Agreement as to performance, compensation, and interpretation of satisfactory fulfillment of the terms of this Agreement *shall be determined* by the STATE.... Nothing herein contained shall impair the Consultant's [Defendant's] right to file suit in the courts of the State of Nevada.

NDOT contract, § 8, at 12 (emphasis added). This clause does not merely confer jurisdiction or require the parties to submit to jurisdiction, it unequivocally states that the NDOT *will determine* these disputes. Only the possibility of suit in the "courts of the State of Nevada" is excepted. There is nothing permissive in this statement, except that suit may be brought in Nevada state court. *See id.*

When Plaintiff signed the 1993 subcontract incorporating this provision into that agreement, Plaintiff agreed to resolve its disputes with Defendant arising out of the NDOT contract and the 1993 subcontract according to the provisions of Section 8. Indeed, for Plaintiff to argue that the NDOT contract provisions do not apply ignores the pervasiveness of the NDOT requirements and oversight contemplated by the entire project and associated agreements.

■ In a different vein, Plaintiff argues that because some of its claims relate to events in 1996 (or thereafter), they relate to services rendered for Defendant and NDOT outside the 1993 subcontract, and that there-

fore the NDOT contract provisions should not apply. *See* Plaintiff's Response, at 2. In sum, Plaintiff argues that it never agreed to the forum selection provisions at all for the work performed after what Plaintiff calls the "termination" of the 1993 subcontract. The Court finds this argument unavailing regarding the venue issue. It is impossible to determine until the merits of the parties' disputes are resolved whether certain of the monies or relief Plaintiff alleges as damages are due under the parties' original subcontract executed in 1993, under an extension of that contract that occurred as a factual or legal result of the parties' conduct, under a different oral understanding the parties reached, or under an equitable theory of quantum meruit or unjust enrichment. It is clear, however, that some of Plaintiff's claims arise from the 1993 subcontract between the parties or require its interpretation. Other claims must be evaluated in light of the parties' practices and in the context of their prior dealings under that agreement. In any event, all Plaintiff's claims arise in the context of and during the parties' performance of services for the benefit of NDOT and all Plaintiff's claims are thus interrelated. Therefore, it is impossible for this or any court to identify which claims might later be found to have been arisen outside the 1993 subcontract. *Cf. Louisiana Ice Cream Distrib. Inc. v. Carvel Corp.*, 821 F.2d 1031, 1034 (5th Cir.1987) (decision on Rule 12(b)(3) is so intertwined with merits that mandamus review is inappropriate). Judicial economy and the interests of justice are best served by allowing the NDOT or the State of Nevada to be the forum for resolution of these parties' disputes.

### 3. *Reasonableness of Enforcement*

Since the Court concludes that the parties are bound by a forum selection clause incorporated in their subcontract, Plaintiff can avoid enforcement of the provision only if it shows that the clause is unreasonable under the circumstances. *See International Software Systems, Inc.*, 77 F.3d at 114. Plaintiff, however, has not articulated any grounds for finding that requiring it to adhere to its agreement and pursue the disputes in Nevada would lead to an unreasonable, unjust, or impractical result. Plaintiff has made no showing that the incorporation of these clauses were the result of fraud or overreaching; that it would be deprived of its day in court; that fundamental unfairness of the chosen law would deprive Plaintiff of a remedy; [21] or that enforcement would contravene any strong public policy. *See Haynsworth*, 121 F.3d at 963. Therefore, the Court finds that Plaintiff is bound by these contract provisions, that the provisions mandate that Plaintiff pursue its complaint against Defendant in Nevada, and therefore that venue in the Southern District of Texas is improper.

### IV. *CONCLUSION*

For the foregoing reasons, the Court concludes that Defendant's Motions to Dismiss should be granted in part and this case is dismissed. It is therefore

**ORDERED** that Defendant's Motions to Dismiss are **GRANTED to the extent that suit may not be filed in federal district court Texas, but must instead be adjudicated either by the Nevada state courts or the NDOT as referee.**[22]

---

**21.** In fact, Nevada law "recognizes causes of action identical to those asserted here by [Plaintiff]." Defendant's Memorandum, at 19.

**22.** This Court does not opine on which of these two fora are appropriate. That is left for the Nevada authorities to determine as necessary.