**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-30921


IN THE MATTER OF PIERRE A. LAPEYRE

Debtor

_____


PIERRE A. LAPEYRE

Appellant - Cross-Appellee,

v.

A.M. DUPONT CORPORATION

Appellee - Cross-Appellant.


Appeals from the United States District Court
for the Eastern District of Louisiana
January 29, 2003


Before WIENER and DENNIS, Circuit Judges, and LITTLE[*], District
Judge.

DENNIS, Circuit Judge:[**]

_____

[*] District Judge of the Western District of Louisiana, sitting
by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

-1-

This appeal involves two cases consolidated in the United States Bankruptcy Court for the Eastern District of Louisiana concerning the bankruptcy of Debtor/Appellant/Cross-Appellee Pierre A. Lapeyre ("Lapeyre" or "debtor"). In the first action, removed from state court, Appellee/Cross-Appellant A.M. Dupont Corporation ("AMD") sued Lapeyre to recover sums he caused to be paid in breach of his fiduciary duty. In the second, an adversary proceeding filed in the bankruptcy court, AMD sued Lapeyre to determine the dischargeability of his debts. After a bench trial, the bankruptcy court ruled that the debtor owed AMD $571,281, and that $100,000 of the debt was dischargeable; the bankruptcy court rendered the judgment in favor of AMD and against the debtor Lapeyre in the amount of $471,281. The district court affirmed. For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND for determination of the amount of prejudgment interest owed to AMD.

## I. BACKGROUND

Lapeyre was a shareholder and director of AMD, serving as its president from 1982 to 1995. AMD is a family-owned, Louisiana corporation, which received its income mainly from oil and gas and real estate interests. During the relevant period, AMD's officers, directors, and shareholders were as follows:

| Pierre A. Lapeyre | President, Director | 175 Shares |
| Albert F. Dupont | Secretary/Treasurer, Director | 150 Shares |
| Muriel M. Dupont | Vice President, Director | 200 Shares |
| Marion L. Dupont | Vice President, Director | 200 Shares |
| Louis Lapeyre | No Office | 25 Shares |

Lapeyre had effective control of AMD through a voting trust that contained his and Marion Dupont's shares. These 375 shares equaled 50% of the outstanding shares and provided Lapeyre with effective majority control over AMD because Louis Lapeyre's 25 shares had been pledged to AMD and were never voted.

Before 1985, AMD owned half of A.M. and J.C. Dupont, Inc. ("Dupont Inc."), which in turn owned a department store in Houma, Louisiana. From 1980 to 1984, Dupont Inc. paid AMD $219,575, which was one half of the management fees for running the store while its own officers and directors received the other half of the fees. After 1985, AMD became the sole owner of Dupont Inc., and Pierre Lapeyre became the sole AMD director or officer responsible for running the department store.

A series of financial dealings ensued. In return for managing the department store, Lapeyre, acting as AMD's president/director, paid $430,541 of AMD's funds for management fees either to himself or to his company, Euclid Engineering Co. ("Euclid"). The payments were as follows: $163,966 in 1988; $98,300 in 1989; $54,160 in 1990; $23,315 in 1992; $53,050 in 1993; and $37,750 in 1996. Although notice of these fees was given to the AMD Board of

Directors ("Board"), the Board never gave its approval. Also, pursuant to a Board resolution, Lapeyre spent $459,710 of AMD's funds to develop the Exervision, an exercise machine for which he held the patent. In addition, a 1983 resolution by the Board allowed Lapeyre, as a Board director to borrow up to $100,000 from AMD. However, Lapeyre borrowed in excess of this amount for both himself and Euclid. He and Euclid currently owe $370,976 to AMD for past loans. Finally, AMD's Board agreed to pay Lapeyre $2,000 a month as President and $600 a month as a director, but did not consistently make these payments. Consequently, AMD still owes Lapeyre $96,202 in back pay.

In May 1992, after struggling financially, AMD filed for bankruptcy. A reorganization plan was confirmed in 1994, and the case was closed in 1996. In January 1995, Lapeyre was removed as President of AMD, and the next month AMD sued him in state court, alleging various fiduciary breaches based on Louisiana law. In December 1998, Lapeyre filed for Chapter 11 bankruptcy (converted to a Chapter 7 proceeding in 2001) and removed the state suit to the Bankruptcy Court in the Eastern District of Louisiana. After removal, AMD challenged the dischargeability of its claims originally asserted in the state suit. In November 2000, the bankruptcy court rendered judgment in favor of AMD and against Lapeyre in the amount of $471,281 ($571,281 total debt, of which $100,000 was dischargeable). On appeal, the United States District

-4-

Court for the Eastern District of Louisiana affirmed on all grounds, and the parties timely appealed.

Lapeyre challenges the bankruptcy court's determinations of the following issues: (1) the validity of post-petition management fees, (2) the reimbursement of business expenses, (3) the imputation of loan repayments, (4) the application of various offsets, and (5) the dischargeability of the debts in bankruptcy. AMD contests the following: (1) Lapeyre's standing to appeal, (2) the validity of pre-petition management fees, (3) the reimbursement of research and development expenses, (4) the reimbursement of litigation expenses, and (5) prejudgment interest.

## II. STANDING

We must first determine whether the debtor, Lapeyre, has standing to bring this appeal. Although this issue was not raised in the district court, it is a jurisdictional objection that cannot be waived. *In re Weaver*, 632 F.2d 461, 462 n.6 (5th Cir. 1980). Under 11 U.S.C. §323, upon appointment of a trustee, the trustee, not the debtor, has the exclusive capacity to represent the estate. *In re Educators Group Health Trust*, 25 F.3d 1281, 1284 (5th Cir. 1994) ("If a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim.").

But a party other than the trustee, including the debtor, has

a right to appeal a bankruptcy order if it is a "person aggrieved." *In re San Juan Hotel*, 809 F.2d 151, 154 (1st Cir. 1987); *Rohm & Hass Tex., Inc., v. Ortiz Bros Insulation, Inc.*, 32 F.3d 205, 210 n.18 (5th Cir. 1994). "A litigant qualifies as a 'person aggrieved' if the order diminishes his property, increases his burdens, or impairs his rights." *In re San Juan Hotel*, 809 F.2d at 154; *see also In re Fondiller*, 707 F.2d 441, 443 (9th Cir. 1982)("To have standing to ... appeal, appellant must demonstrate that she was directly and adversely affected pecuniarily by the order of the bankruptcy court."); *In re Gucci*, 126 F.3d 380, 388 (2d Cir. 1997)("[A]n 'aggrieved person' [is] a person 'directly and adversely affected pecuniarily' by the challenged order of the bankruptcy court.").

However, the rule for standing in bankruptcy is stricter than Article III's "injury in fact" test. *In re Gucci*, 126 F.3d at 388. The stricter rule is imposed to avoid unreasonable delay and protracted litigation that does not serve the interests of either the debtor's estate or its creditors. *In re San Juan Hotel*, 809 F.2d at 154. Therefore, a hopelessly insolvent debtor in a bankruptcy proceeding generally will not have standing to appeal a bankruptcy order because the order will not diminish the debtor's property, increase his burdens, or detrimentally affect his rights. *In re San Juan Hotel*, 809 F.2d at 154-55. In other words, a party

-6-

will not have standing to appeal a bankruptcy order unless it directly and pecuniarily affects his property, obligations, or rights.

In the instant case, the debtor challenges the bankruptcy order concerning the amount owed to AMD for his breach of fiduciary duty and the dischargeability of that debt in bankruptcy. If AMD is successful, damages owed based on Lapeyre's fiduciary breaches will not be discharged in bankruptcy and will still be owed by Lapeyre. Because an unfavorable bankruptcy order will render Lapeyre personally liable for debts even after discharge, this proceeding directly and pecuniarily affects his obligations. Therefore, we find that Lapeyre has standing to bring this appeal.

### III. ANALYSIS

A. Standard of Review

"This Court, acting as a second review court, reviews the bankruptcy court's findings of fact under the clearly erroneous standard, and the bankruptcy court's conclusions of law *de novo*." *In re U.S. Brass Corp.*, 301 F.3d 296, 306 (5th Cir. 2002) (internal quotations and citations omitted).

B. Pre-Petition Management Fees

Lapeyre and Euclid received $323,816 in department store management fees from 1986 until AMD's bankruptcy filing in 1992.

With regard to the pre-petition fees, AMD argues that the management fees were derived from Lapeyre's breach of his duty of fiduciary care and loyalty to AMD. The bankruptcy court rejected Lapeyre's argument, and the district court agreed. "Breach of duty is a question of fact, or a mixed question of law and fact, and the reviewing court must accord great deference to facts found and inferences drawn by the finder of fact." *Boykin v. La. Transit Co.*, 707 So.2d 1225, 1231 (La. 1998).

Section 91(A) of the Louisiana Business Corporations Law ("LBCL") provides:

> Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment, and skill which ordinarily prudent men would exercise under similar circumstances and in like positions; however, a director or officer shall not be held personally liable to the corporation or the shareholders thereof for monetary damages unless the director or officer acted in a grossly negligent manner as defined in Subsection B of this Section, or engaged in conduct which demonstrates a greater disregard of the duty of care than gross negligence, including but not limited to intentional tortious conduct or intentional breach of his duty of loyalty.

LA. R.S. § 12:91(A). Thus, officers or directors of a corporation will be in breach of their fiduciary duties if they: (1) are grossly negligent with respect to their duty of care, (2) intentionally breach their duty of loyalty, or (3) intentionally commit tortious conduct. Only the first two types of conduct have been alleged in this case.

First, AMD contends that Lapeyre was grossly negligent in discharging his duties by accepting unwarranted fees for the management of the AMD-owned department store in Houma. Section 91(B) of the LBCL defines "gross negligence" as "a reckless disregard of or a carelessness amounting to indifference to the best interests of the corporation or the shareholders thereof." LA. R.S. 12:91(B). Therefore, AMD must prove that Lapeyre recklessly disregarded the best interests of the corporation in charging and receiving payment of these management fees. *See* LA. R.S. 12:91(E) (providing that a person alleging a breach of the duty of care owed by an officer or director under Section 91(A) has the burden of proving the alleged breach of duty).

Second, AMD argues that Lapeyre breached his duty of loyalty by putting his own financial interests above those of the corporation. When a director contracts with his corporation, those dealings are subject to rigorous scrutiny. *Levy v. Billeaud*, 443 So.2d 539, 543 (La. 1983). An interested director has the burden of proving his good faith, the inherent fairness of the contract from the standpoint of the corporation, and that the contract was essentially an arm's length transaction. *Church Point Wholesale Beverage Co. v. Voitier*, 706 So.2d 1015, 1019-20 (La. App. 3d Cir. 1998).

AMD contends that the management fees were excessive and thus

violated both duties because: (1) the store paid for the employment of a full-time manager; (2) Lapeyre allegedly only spent three hours per month on the actual premises; and (3) the management of the store has required very little time by the new manager installed after the bankruptcy. Lapeyre counters, however, by providing evidence that the management fees he received were similar to the amounts received by AMD and Dupont Inc.'s managers and directors before Lapeyre took over management of the store.

The bankruptcy court agreed with Lapeyre, finding that there was no fiduciary breach because (1) AMD was aware that management fees had been paid for managing the store from 1980 to 1984, even before Lapeyre took over; (2) the fees paid after the Debtor became President did not significantly differ from those paid from 1980 through 1984; and (3) Lapeyre was directly responsible for the store, which took time away from his work at Euclid. Based on these findings, the bankruptcy court concluded that Lapeyre's actions did not rise to the level of recklessness and that overall there was no fiduciary breach.

We see no clear error in the bankruptcy court's findings. There is sufficient evidence to support the court's conclusion that these were reasonable management fees paid in return for rendered services because other parties had received comparable compensation for performing the same duties. The bankruptcy court also reasonably found that Lapeyre satisfied his burden of proving good

faith, that the fees were fair, and that it was an arm's length transaction because there was sufficient evidence that both Lapeyre's fees and responsibilities were comparable to what was done before Lapeyre assumed control of the store's management. Accordingly, we affirm the bankruptcy court's decision that AMD is not entitled to reimbursement for the management fees paid to Lapeyre and Euclid prior to AMD's bankruptcy.

## C.    Post-Petition Management Fees

Next we consider whether AMD may be reimbursed for $105,725 in management fees that Lapeyre paid to Euclid from AMD funds after AMD filed for bankruptcy.  The Lapeyre bankruptcy court held that these transfers were not authorized by the AMD bankruptcy court, and thus they were invalid post-petition transfers under 11 U.S.C. § 549(a).  Lapeyre challenges this ruling because the issue of whether the transfers were authorized was neither tried nor pleaded.

Rule 15(b) of the Federal Rules of Civil Procedure provides:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment.

Amendments based on Rule 15(b) are reviewed for abuse of discretion. *Triad Electric & Controls, Inc. v. Power Systems Engineering, Inc.*, 117 F.3d 180, 192 (5th Cir.1997).  AMD did not

raise the issue of post-petition management fees in any pleading and does not contend that this issue was tried by express consent. Therefore, the question is whether the issue was tried with the implied consent of the parties.

While the principal purpose of Rule 15(b) is judicial economy, it will not be pursued at the expense of procedural due process. "Thus, in the absence of express consent, 'trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b), [and] such inferences are to be viewed on a case-by-case basis and in light of the notice demands of procedural due process.'" *Deere & Co. v. Johnson*, 271 F.3d 613, 622 (5th Cir. 2001) (quoting *Triad Electric*, 117 F.3d at 193-94).

In general, a finding of implied consent "depends on whether the parties recognized that an issue not presented by the pleadings entered the case at trial." *Jimenez v. Tuna Vessel Granada*, 652 F.2d 415, 421 (5th Cir. 1981). "Where a party does not recognize the significance of evidence and so fails to contest it, he cannot realistically be said to have given his implied consent to the trial of unpled issues suggested by it, always assuming that his failure to grasp its significance was reasonable." *Id.;* 6A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1493, at 468-69 (1990). "When evidence is introduced that is relevant to a pleaded issue and the party against whom the amendment is urged has no reason to

believe a new issue is being injected into the case, that party cannot be said to have impliedly consented to trial of that issue." *Domar Ocean Trans., Ltd. v. Indep. Ref. Co.*, 783 F.2d 1185, 1188 (5th Cir. 1986).

Here, the bankruptcy court found implied consent without providing a basis for its decision. However, when the district court affirmed, it specifically found that the following testimony by Lapeyre at the trial constituted implied consent, which put at issue whether the post-petition management fees had been judicially authorized:

> Q. Mr. Lapeyre, there is no and was never rendered any order of the bankruptcy court approving you to be paid $5,000 a month as management fees, was there?
> A. I didn't see an order, but Mr. Stacey was our attorney and it was an agreement between--he was representing the court, as far as I understood.
> Q. If there had been such an order, you would have brought it to court today?
> A. Today? Well, I would have given it to Mr. Hof, yes.
> Tr. 4/5/2000, at 65.

Lapeyre also stated that "those bills were part and parcel of the bankruptcy reports. They were never questioned by the trustee, by the attorneys, by Judge Brown or anybody." Tr. 4/5/2000, at 61. We have reviewed the record, and are unable to ascertain any additional evidence or testimony concerning this issue.

The record does not provide sufficient evidence from which it reasonably could be found that the parties recognized that the issue of whether the fees had been judicially authorized had

entered the case at trial. First, AMD's failure to raise a statute of limitation's defense to Lapeyre's claim to the fees indicates that the parties did not consider them to be in dispute. Section 549(d) of the Bankruptcy Code provides that an action contesting a post-petition transfer "may not be commenced after ... the time the case is closed or dismissed." 11 U.S.C. § 549(d). AMD's bankruptcy was closed in 1996. Whether the fees had been authorized by the AMD bankruptcy court was not touched upon until the foregoing testimony by Lapeyre in the bankruptcy proceedings in April 2000. Despite the availability of a complete statute of limitations bar to AMD's claim of no authorization, Lapeyre did not raise such a defense until after the bankruptcy court decision requiring reimbursement by Lapeyre to AMD of these post-petition management fees.

The scarcity of evidence indicating that the authorization of post-petition management fees was put at issue, the bankruptcy court's lack of explanation for its decision, and Lapeyre's failure to assert his clear statute of limitations defense strongly tend to prove that Lapeyre was not aware that the fee authorization issue had been introduced in this case. Therefore, we find that it was an abuse of discretion for the bankruptcy court to find that this issue was tried by implied consent and that the district court erroneously failed to reverse the bankruptcy court's decision. For the foregoing reasons, we conclude that the issue of whether the

-14-

post-petition management fees paid to Lapeyre had been authorized by the AMD bankruptcy court was not put at issue or tried by implied consent. Therefore, we reverse the bankruptcy court's decision to award AMD $105,725 as reimbursement of unauthorized post-petition management fees.

D.   Research & Development Costs

In 1986, Lapeyre obtained a patent for an exercise machine called the Exervision. On December 24, 1986, Lapeyre and AMD entered into a franchise agreement, which the AMD Board unanimously approved on January 17, 1987. Based on the franchise agreement, AMD was to pay all costs of developing the patent held by Lapeyre in return for receiving "100% net after taxes profits generated in the State of Louisiana." As a consequence, AMD spent $459,710 to develop and produce the Exervision. Unfortunately, these expenditures were not fruitful as the venture never proved profitable. AMD contends that the sums spent on the project breached Lapeyre's fiduciary duty because (1) the franchise agreement was grossly unfair and (2) Lapeyre failed to disclose material information. The bankruptcy court disagreed, concluding that the agreement was fair and that there was no fiduciary breach.

Under Louisiana law, a contract between a corporation and a director of that corporation is valid if either (1) the board or the shareholders approved the contract knowing the material facts as to the director's interest and the contract or transaction, or

(2) the contract or transaction was fair to the corporation at the time it was authorized, approved, or ratified by the board or the shareholders.  LA. R.S. §12.84(A).

Because there was sufficient evidence for the bankruptcy court to find that the contract here was fair to AMD at the time it was made, there is no clear error.  Prior to entering into the franchise agreement, Lapeyre informed the Board of the terms of the agreement and the estimated costs for research and development. AMD was responsible for all costs of developing the patent held by Lapeyre, but was to receive "100% net after taxes profits generated in the State of Louisiana."  Albert Dupont was a member of the AMD Board of Directors at the time the Board approved the agreement. He testified that in consideration for funding the research costs of the project, AMD would be granted an exclusive Louisiana franchise to market the device and would keep 100% of net after-tax profits generated in Louisiana.  In addition, Mr. Dupont also testified that an additional purpose of the project was to minimize AMD's tax liability.  After considering this information, the Board unanimously approved the franchise agreement.  Thereafter, Lapeyre consistently kept the Board informed of the project's progress at every Board meeting for the next two years, and the Board never complained or contested the expenditures.

Therefore, the terms of the agreement called for AMD to participate in a project to take advantage of Lapeyre's patent by

paying the costs associated with developing the project. In return, AMD would receive both an exclusive franchise in Louisiana if the investment succeeded, as well as immediate tax benefits even if the plan met with no success. The project's ultimate failure does not mean that the agreement was not fair at the time the investment was made. Therefore, we do not find that the bankruptcy court was clearly erroneous in determining that this contract was fair, and we affirm its decision to deny AMD reimbursement for these costs.

E.    Business Expense Reimbursements

During his tenure as President of AMD, Lapeyre paid himself $106,759, purportedly as reimbursement for business expenses, including secretarial, travel, and automobile expenses. AMD seeks return of these payments because they were not supported by sufficient documentation. The bankruptcy court held that Lapeyre violated Section 91 of the LBCL because he recklessly disregarded his duty of care by presenting and accepting payments for which he could not show justification. The court then rendered judgment in favor of AMD. Lapeyre challenges this finding, alleging that the burden is on AMD to prove that the expenses were improper.

Under Section 91 of the LBCL, AMD must prove that Lapeyre breached his fiduciary duty of care in receiving improper expense reimbursements. However, AMD reasonably satisfied this burden

through the testimony of its expert witness, Charles Theriot, who identified a number of expense reimbursements that were paid to Lapeyre with little or no documentation. Lapeyre has offered no documentation or other evidence to support the validity of these expenses. Consequently, it was not clearly erroneous for the bankruptcy court to conclude that Lapeyre breached his fiduciary duty of care with respect to these alleged business expense reimbursements. Therefore, we affirm the decision of the bankruptcy court.

F. Loans

When AMD sued Lapeyre in state court for fiduciary breach, Lapeyre owed AMD $258,605 and Euclid owed AMD $114,371 for advances made by AMD. However, the AMD Board had authorized its directors, including Lapeyre, to borrow only up to $100,000. The bankruptcy court held that all loan amounts in excess of $100,000 were unauthorized and that these unauthorized loans constituted a breach of Lapeyre's fiduciary duty. Although Lapeyre does not contest that his receipt of the unauthorized loans was a fiduciary breach, he contends that a $96,338 payment by Euclid to AMD should have been credited to his, not Euclid's, balance.

In December 1988, Euclid executed a note in favor of AMD for

$128,679. In December 1989, Euclid issued a check for $96,338 to AMD, but provided no instruction as to how the check should be applied. AMD applied the check to Euclid's debt, but Lapeyre now argues that it should have been applied to his balance.

La. Civil Code article 1864 allows a debtor to provide instructions as to which debt his payment should be imputed. But if he fails to do so, the creditor may impute the payment, which will stand if the debtor remains silent after learning of the imputation. LA. CIV. CODE art. 1867; *Marks v. Deutsch Constr. Co.*, 258 So.2d 676 (La. App. 4th Cir. 1972). Here, Lapeyre was silent as to imputation from the time of the payment in 1989 until the trial in 2000. Therefore, we affirm the bankruptcy court's decision as based on sufficient evidence to uphold AMD's imputation of the payment to Euclid's debt.

G. Additional Offsets

Lapeyre also argues that he is entitled to certain offsets, which would reduce the amount Lapeyre owes AMD for his fiduciary breaches. Lapeyre seeks offsets for the following: (1) the underpayment of post-petition management fees; (2) the nonpayment of Secretary/Treasurer and Director fees; (3) the underpayment of salary as President; (4) advances made by Euclid to AMD; and (5) the nonpayment of oil and gas management fees. The bankruptcy court denied these offsets, holding that (1) the underpayment of management fees had been previously disallowed; (2) the

-19-

Secretary/Treasurer and Director fees were unauthorized post-petition transfers and were not disclosed in AMD's bankruptcy; (3) the underpayment of salary and the Euclid advances had already been accounted for; and (4) Lapeyre presented no evidence concerning the oil and gas management fees.

First, Lapeyre argues that he is entitled to an offset because AMD failed to compensate him for some additional post-petition management services he performed. However, Lapeyre presented no proof that he disclosed or sought authority to perform or be compensated for these particular post-petition management services. Accordingly, we affirm the bankruptcy court's decision to deny an offset for these fees.

Second, Lapeyre is not entitled to an offset for Secretary/Treasurer and Director fees allegedly due him because these fee obligations were never disclosed to the AMD bankruptcy court. Lapeyre's argument that no authorization is needed for compensation to insiders fails to consider 11 U.S.C. § 1129(a)(5)(B), which mandates that all compensation to insiders must be disclosed to the court. 11 U.S.C. § 1129(a)(5)(B)("The court shall confirm a plan only if ... the proponent of the plan has disclosed the identity of any insider ... and the nature of any compensation for such insider."). Here, Lapeyre has provided no evidence that he disclosed to the AMD bankruptcy court that he was owed Secretary/Treasurer or Director fees. These fees were not

disclosed in either the AMD reorganization plan or the disclosure statement. Therefore, the bankruptcy court did not clearly err in deciding that he is not entitled to an offset for these fees.

For the same reason, Lapeyre is not entitled to an offset for the alleged underpayment of $96,202 owed for his service as President of AMD. These fees, like the Secretary/Treasurer and Director fees, were not disclosed in either the AMD reorganization plan or the disclosure statement.

Fourth, Lapeyre seeks an offset for $28,579 in advances that his company Euclid made to AMD. These advances, however, were taken into account by the bankruptcy court in determining the amount Euclid owed AMD. The bankruptcy court held that Euclid owed AMD $85,792 overall. Euclid originally owed AMD $114,371 ($83,037 in principal and $31,334 in interest), but when the $28,579 offset is subtracted from this figure, the total equals $85,792, which is the amount actually awarded to AMD. Consequently, we affirm the decision of the bankruptcy court because Euclid and Lapeyre have already received credit for this amount.

Finally, Lapeyre asks for an offset for on-site and oil and gas management fees. The bankruptcy court denied offsets for these fees because Lapeyre presented no evidence that these fees were actually owed to him. The debtor has neither identified nor provided any further evidence in support of these offsets and we are unable to locate any. Therefore, we affirm the bankruptcy

-21-

court in holding that Lapeyre has not proven that he is owed payment for these fees.

Because we find that Lapeyre is not entitled to receive offsets for any of the above items, we affirm this portion of the bankruptcy court's decision.

## H.   Litigation Costs & Expenses

AMD seeks reimbursement for litigation expenses for its bankruptcy filing, contending that the costs of its bankruptcy filing flowed directly from Lapeyre's fiduciary breaches.  The bankruptcy court denied reimbursement, finding insufficient evidence to support AMD's contention.  The bankruptcy court held that the main reasons for the filing were the threatened foreclosure by the Duponts and the decline in the Houma area economy.  Because it is not disputed that these were legitimate reasons for AMD's bankruptcy filing, we find no clear error and affirm.

## I.   Prejudgment Interest

AMD also seeks an award of prejudgment interest for the amount that is not dischargeable in bankruptcy,[1] namely, (1) $244,397 in improper loans, (2) $106,759 in improper expense reimbursements, and (3) $14,400 in unpaid rents.  The bankruptcy court did not

---

[1]   AMD also sought prejudgment interest for $105,725 in allegedly unauthorized post-petition fees.  However, we do not need to consider prejudgment interest for these fees, as we have reversed the underlying award.

-22-

discuss whether prejudgment interest should be awarded, but the district court denied prejudgment interest on all claims. Lapeyre contends that prejudgment interest is solely within the discretion of the bankruptcy court. He argues that interest is only due because the debts are not dischargeable, thus this is a federal question, not a state law claim. Whether prejudgment interest should have been awarded is an issue of law, which we review *de novo*.

If a nondischargeable debt arises under state law, then the award of prejudgment interest is governed by state law. *In re Niles*, 106 F.3d 1456, 1463 (9th Cir. 1997). In bankruptcy proceedings, where bankruptcy law fails to address a specific issue and no strong federal interest is implicated, the *Erie* doctrine will dictate the application of state law to underlying state law claims. *In re Omni Video, Inc.*, 60 F.3d 230, 232 (5th Cir. 1995). No bankruptcy or federal statute addresses the issue of prejudgment interest and we are aware of no strong federal interest in denying a party the right to prejudgment interest. Therefore, state law will determine whether prejudgment interest is available for nondischargeable debts premised on state law claims.

Regarding the improper loans, the district court denied prejudgment interest because an appropriate interest rate has already been taken into account. The note evidencing the

indebtedness for the loans provided for a 9% annual interest rate, and the $244,397 award includes this amount. The loans were found improper because Lapeyre's fiduciary breaches, which were based on Louisiana law, therefore any award of prejudgment interest is also based on Louisiana law. Under Louisiana law, the purpose of prejudgment interest is to "fully compensate the injured party for the use of funds to which he is entitled but does not enjoy because the defendant has maintained control over the funds." *Sharbono v. Steve Lang & Son Loggers*, 696 So.2d 1382, 1386 (La. 1997). Article 2000 of the Louisiana Civil Code provides: "When the object of the performance is a sum of money damages, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest...." Here, the object of Lapeyre's performance is to repay the amounts advanced by AMD. The parties agreed to an interest rate of 9%, which has been included in AMD's recovery. Therefore, AMD is not entitled to any additional prejudgment interest on this claim.

AMD also seeks prejudgment interest on improper expense reimbursements and unpaid rent.[2] Again, under Louisiana law, the

---

[2]     The bankruptcy court found that Euclid owed AMD $14,400 in accrued rent. Neither party has challenged this determination, but whether Lapeyre owes prejudgment interest on this amount is still before us because AMD requests prejudgment interest on all amounts it recovers.

-24-

purpose of prejudgment interest is to make the plaintiff whole. Prejudgment interest is "awarded to make an injured party whole by compensating that party for the time-value of money to which that party was entitled from the date set by the legislature, but over which the defendant, in retrospect, had wrongfully continued to exercise dominion and control while the suit was pending." *Sharbono*, 696 So. 2d at 1388. Here, AMD must be compensated with prejudgment interest for the time-value of the money Lapeyre wrongfully held in order to be made whole and is entitled to prejudgment interest on these claims.

We must next determine the time when prejudgment interest begins to run. Prejudgment interest is "a necessary component of the full reparation owed to an obligee who has been aggrieved." 6 SAUL LITVINOFF, LA. CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS § 9.13, at 264 (1999); *Trans-Global Alloy v. First Nat'l Bank*, 583 So.2d 443, 458 (La. 1991). La. Civil Code article 3005 states: "The mandatary owes interest, from the date used, on sums of money of the principal that the mandatary applies to his own use." Therefore, when managing the affairs of another, a person "who has converted to his own use money belonging to the person whose affairs he managed owes interest on that money from the time he converted it". LITVINOFF, *supra*, § 9.16, at 268. Corporate officers are mandataries of the corporation. *Bolding v. Eason Oil Co.*, 170 So.2d 883 (La.

-25-

App. 4th 1965); *Raymond v. Palmer*, 35 La. Ann. 276 (La. 1883). Therefore, a corporate officer who uses the money or property of a corporation for his own use will be liable for prejudgment interest from the date used. *See C & B Sales & Service, Inc. v. McDonald*, 95 F.3d 1308, 1319 (5th Cir. 1996)(awarding prejudgment interest against corporate officer for breach of fiduciary duty based upon Louisiana law from date unauthorized profits were acquired).

Here, because both claims are based on Lapeyre's misappropriation of AMD's money and property for his own use, he owes prejudgment interest from the time he received these benefits. Therefore, we reverse the decision denying prejudgment interest on the improper expense reimbursements and accrued rent and remand to the bankruptcy court for a determination of the amount of prejudgment interest owed, pursuant to the foregoing principles.

J.   Dischargeability

In a Chapter 7 proceeding, the debts of the bankrupt will be discharged, unless they are classified as nondischargeable. Based on 11 U.S.C. § 523(a)(4), the bankruptcy court found that Lapeyre's debts (except for the initial $100,000 loan) were not dischargeable. Lapeyre's contends that his debt to AMD is dischargeable because corporate officers do not fall within the concept of fiduciary duty under § 523(a)(4). This raises an issue of law, which we review *de novo*.

Under 11 U.S.C. § 523(a)(4), a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny," may not be discharged in bankruptcy. In order for this provision to apply, the debtor must: (1) commit defalcation and (2) act in a fiduciary capacity.

First, it is clear that Lapeyre committed defalcation. "Defalcation" is a "willful neglect of duty, even if not accompanied by fraud or embezzlement." *In re Moreno*, 892 F.2d 417, 422 (5th Cir. 1990). In this circuit, "willful neglect" is "essentially a recklessness standard." *In re Schwager*, 121 F.3d 177, 185 (5th Cir. 1997). Therefore, if a debtor acts recklessly while acting in a fiduciary capacity, then those debts will not be dischargeable. In this case, Lapeyre's fiduciary breaches satisfy this recklessness standard because, under Louisiana law, a breach of the fiduciary duty requires a finding of recklessness. *See* LA. R.S. 12:91.

Second, Lapeyre's defalcation occurred while he was acting in a fiduciary capacity for the purposes of §523(a)(4). Under §523(a)(4), the concept of fiduciary duty is narrowly defined, applying only to technical or express trusts. *In re Angelle,* 610 F.2d 1335, 1338-39 (5th Cir. 1980). In addition, to form a valid trust (1) the trust relationship must exist prior to the act creating the debt and without reference to that act, and (2) trust-

like obligations must be imposed. *Id.* at 1340-41. These requirements may be satisfied by statute or by common law. *In re Bennett*, 989 F.2d 779, 784-85 (5th Cir. 1993).

This court in *In re Moreno* held that the officer of a corporation acting in his capacity as a corporate officer was a fiduciary for purposes of §523(a)(4). 892 F.2d at 422. Similarly, in *In re Bennett*, we held that the general partner of a limited partnership was also a fiduciary for purposes of this section. 989 F.2d at 787. In *Bennett*, we noted that both general partners and corporate officers had the duty to administer the affairs of their respective organizations solely for the benefit of that organization and that neither was permitted to place himself in a position where it would be for his own benefit to violate this duty. *Id.* The *Bennett* court concluded that these "obligations are more than a fiduciary relationship created in response to some wrongdoing," and thus these positions met the narrow requirements for nondischargeability under §523(a)(4). *Id.*

Lapeyre was also subject to these same duties as President of AMD. Therefore, he was acting in a fiduciary capacity for the purposes of §523(a)(4). Because he committed defalcation while acting in this fiduciary capacity, we affirm the bankruptcy court's finding and hold that Lapeyre's debts to AMD are not dischargeable in bankruptcy.

-28-

## IV. CONCLUSION

For the foregoing reasons, we reverse the bankruptcy court's decision to award $105,725 to AMD as reimbursement for post-petition management fees paid to Lapeyre, and we reverse that court's refusal to award AMD prejudgment interest for Lapeyre's improper expense reimbursements and unpaid rent. We AFFIRM the bankruptcy court's judgment in all other respects. Accordingly, we AFFIRM IN PART, REVERSE IN PART, and REMAND the case to the bankruptcy court solely for determination of the amount of prejudgment interest owed to AMD.